UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

BETHLEHEM CONSTRUCTION, INC.,
Washington corporation,

          Plaintiff,

      v.

TRANSPORTATION INSURANCE COMPANY,
a foreign corporation; and ST.
PAUL REINSURANCE COMPANY,
LIMITED, a foreign corporation,

         Defendants.

NO. CV-03-0324-EFS

**ORDER GRANTING IN PART AND
DENYING IN PART TRANSPORTATION'S
PREJUDGMENT INTEREST MOTION,
GRANTING IN PART AND DENYING IN
PART BETHLEHEM'S CONFLICT OF LAW
MOTION, AND GRANTING SUMMARY
JUDGMENT IN BETHLEHEM'S FAVOR ON
THE ISSUE OF WHETHER *CUMIS*
COUNSEL SHOULD HAVE BEEN
APPOINTED BY TRANSPORTATION**

On October 7, 2004, Transportation Insurance Company ("Transportation") moved the Court for summary judgment on Bethlehem Construction, Inc.'s ("Bethlehem's") claim for prejudgment interest on unliquidated damages ("Prejudgment Interest Motion."). (Ct. Rec. 45.) St. Paul Reinsurance Company, Ltd. ("St. Paul") joined in on TIC's Prejudgment Interest Motion on October 15, 2004. (Ct. Rec. 53.)   In opposition to Transportation's Prejudgment Interest Motion, Bethlehem filed not only an opposing memorandum (Ct. Rec. 52-1), but also filed a cross-motion for partial summary judgment ("Conflict of Law Motion") (Ct. Rec. 55).   In its Conflict of Law Motion, Bethlehem moved the Court to declare California law, as opposed to Washington law, controls the

ORDER ~ 1

prejudgment interest, obligation to appoint independent counsel, and punitive damage issues arising in this case. Defendants oppose Bethlehem's Conflict of Law Motion, arguing Washington law, and not California law, controls the three above-stated topics.

Oral argument was heard by the Court on the Prejudgment Interest and Conflict of Law Motions on December 3, 2004 (Ct. Rec. 107), and additional briefing on the duty to defend issue was ordered and received by the Court in mid-February 2006 (Ct. Recs. 478 & 485). After considering the parties' respective arguments and reviewing the submitted materials and cited authority, the Court is fully informed on the issues raised in the parties' motions and for the reasons outlined below, hereby grants in part and denies in part Defendants' Prejudgment Interest Motion and grants in part and denies in part Bethlehem's Conflict of Law Motion. In addition, the Court *sua sponte* grants summary judgment in favor of Bethlehem on the issue of whether Transportation was obligated to provide counsel independently selected by Bethlehem ("*Cumis* counsel") in the underlying third-party action filed against Bethlehem by Steveco, Inc. ("Steveco").

///
///
///
///
///
///
///
///

ORDER ~ 2

# I. Background [1],[2]

## A. The Parties & Underlying Insurance Policies

Bethlehem is a construction company incorporated in Washington, with offices in Washington and California. (Ct. Rec. 52-2 ¶ 2.)  At all relevant times, Michael J. Addleman has served as Bethlehem's president. *Id. ¶ 1.*  In 1999 and 2000, Eric Zimmerman, an insurance agent with Bratrud Middleton Insurance Company in Tacoma, Washington sold Bethlehem insurance policies underwritten by Transportation and St. Paul that covered risks associated with construction projects Bethlehem was involved with. *Id.* ¶ 6-7.  On several occasions prior to purchasing the Transportation and St. Paul policies, Mr. Addleman claims to have informed Mr. Zimmerman that the policies were intended to cover work performed in California, where Bethlehem was set to construct the cold storage facility discussed below. *Id.* ¶ 6.

///

-----

[1] In ruling on a motion for summary judgment, the Court considers the facts and all reasonable inferences therefrom as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1972) (per curiam).  The following factual recitation was created with this standard in mind.

[2] Many of the facts contained in this factual recitation are immaterial to the issues presented in the motions addressed in this Order.  Nevertheless, the facts were presented to place the parties' respective arguments in context.

ORDER ~ 3

**1. Transportation Policy**

Under the Bodily Injury and Property Damage Liability Sections ("Coverage A Sections") of Transportation Commercial General Liability Insurance Policy Nos. C1082227545 ("Transportation Policies"),[3] Transportation and Bethlehem agreed Transportation would pay those damages Bethlehem became legally obligated to pay as a result of "property damage" covered by the policies. (Ct. Rec. 190 Exs. 1 at 2 & 2 at 2.)  In addition, the parties agreed Transportation had "the right and duty to defend the insured against any 'suit' seeking those damages." *Id.*  One policy covered applicable "property damage" caused by occurrences taking place in the United States during the policy period of December 31, 1999, to December 31, 2000, *id.* Ex. 1 at 2 & 10, and the other policy covered applicable "property damage" caused by occurrences taking place in the United States during the policy period of December 31, 2000, to December 31, 2001, *id.* Ex. 2 at 2 & 10.  The Transportation Policies define "property damage" as follows:

> a. Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*Id.* Ex. 1 at 13 & Ex. 2 at 13.

The following exclusion was included in the Exclusion Sections of the Transportation Policies:

---

[3] Aside from the policy periods, the terms and conditions set forth in the two Transportation Policies appear to be identical.

ORDER ~ 4

This insurance does not apply to:

1. Damage to Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operation hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

*Id.* Ex. 1 at 5 & Ex. 2 at 5. "Your work" was defined in the policies as follows:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

*Id.* Ex. 1 at 13 & Ex. 2 at 13.

The Transportation Policies also provided in their Supplementary Payments Sections that Transportation

will pay, with respect to any claim [it] investigate[s] or settle[s], or any "suit" against an insured [it] defend[s]:

d. All reasonable expenses incurred by the insured at our request to assist [Transportation] in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

*Id.* Ex. 1 at 6 & Ex. 2 at 6. ("Transportation Supplementary Payments Clauses"). "'Suit' means a civil proceeding in which damages because of . . . "property damage" . . . to which the [Transportation Policies] apply[] are alleged." *Id.* Ex. 1 at 13 & Ex. 2 at 13.

In the Commercial General Liability Conditions Sections, the Transportation Policies detail Bethlehem's obligations under the insurance policies. *Id.* Ex. 1 at 9 & Ex. 2 at 9. In relevant part, Bethlehem's obligations included:

ORDER ~ 5

a. You must see to it that [Transportation is] notified as soon as practicable of an "occurrence" or an offense which may result in a claim.  To the extent possible, notice should include:

    (1) How, when and where the "occurrence" or offense took place;

    (2) The names and addresses of any injured persons and witnesses; and

    (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

    (1) Immediately record the specifics of the claim or "suit" and the date received; and

    (2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or suit as soon as practicable.

c. You and any other involved insured must:

    (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

    (2) Authorize us to obtain records and other information;

    (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

    (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Transportation's] consent.

*Id.*

Finally, the Transportation Policies also explain that the coverage provided in their Coverage A Sections was "primary" over all other insurance policies that covered the same losses and obligations, unless those other policies were also primary policies. *Id.*

The Transportation Policies do not include choice of law provisions. *See generally Id.* Exs. 1 & 2.

**2. St. Paul Policy**

Under the Property Damage Liability Coverage Section of St. Paul CGL Gap Insurance Policy No. USG10135 ("St. Paul Policy"), St. Paul and Bethlehem agreed St. Paul would pay those damages Bethlehem became legally obligated to pay as a result of "property damage" to Bethlehem's "work."[4] (Ct. Rec. 252 Exs. A at 4.)  In addition, the parties agreed St. Paul had

> the right and duty to defend the insured against any "suit" seeking damages because of "property damage" to which [the] insurance applies if the insured is not entitled to a defense or indemnification of defense costs under any other policy or policies of insurance.  If the insured is entitled to such a defense or indemnification of defense costs under any other policy or policies on insurance, [St. Paul] will have the right by not the duty to defend the insured against any "suit" seeking damages because of "property damage" to which [the St. Paul Policy] applies.  However, [St. Paul] will have no duty to defend the insured against any "suit" seeking damages for "property damages" to which [the St. Paul Policy] does not apply.

*Id.*  The St. Paul Policy covered applicable "property damage" caused by occurrences taking place in the United States during the policy period of February 16, 2000, to February 16, 2001, *Id.* Ex. A at 1.

---

[4] The St. Paul Policy did not apply "if the damaged work or the work out of which the damage [arose] was performed on [Bethlehem's] behalf by a subcontractor. (Ct. Rec. 252 Ex. A at 5.)

ORDER ~ 7

The St. Paul Policy defines "property damage" as follows:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*Id.* Ex. A at 16. Bethlehem's "work" was defined the St. Paul Policy as follows:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

*Id.* Ex. A at 15.

The St. Paul Policy also provided in its Supplementary Payments Section that St. Paul

will pay, with respect to any claim [it] investigate[s] or settle[s], or any "suit" against an insured [it] defend[s]:

d. All reasonable expenses incurred by the insured at our request to assist [Transportation] in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

*Id.* Ex. A at 7. ("St. Paul Supplementary Payments Clause").

In the Conditions Section, the St. Paul Policy details Bethlehem's obligations under the St. Paul Policy. *Id.* Ex. A at 10-11. In relevant part, Bethlehem's obligations, which were identical to those included in the Transportation Policies, included:

a. You must see to it that [St. Paul is] notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

ORDER ~ 8

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or suit as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [St. Paul's] consent.

*Id.*

Finally, the St. Paul Policy also expressly states:

[St. Paul] will have no duty under this policy to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, [St. Paul] will undertake to do so, but [St. Paul] will be entitled to the insured's rights against all those other insurers.

ORDER ~ 9

*Id.* Ex. A at 11.   In the St. Paul Policy, "'[s]uit'" means a civil proceeding in which damages because of 'property damage' to which [the St. Paul Policy] applies are alleged." *Id.* Ex. A at 16.

The St. Paul Policy does not include a choice of law provision. *See generally Id.* Ex. A.

**B. The Underlying Construction Project & Insurance Claims**

In early 2000, Bethlehem and California Controlled Atmosphere ("CalCA") entered into separate construction contracts with Steveco to jointly design and build a cold storage facility in Bakersfield, California ("storage facility").[5] (Ct. Rec. 174 Ex. 18 at 1.)   The storage facility was to be used by Lucich Farms Cold Storage, LLC ("Lucich Farms") for the storage of table grapes. *Id.* Bethlehem was to design and construct the storage facilities buildings, while CalCA was to design and construct the storage facility's refrigeration system. *Id.* Engel & Company was hired by Bethlehem as a subcontractor to perform certain structural engineering duties Bethlehem was ultimately responsible for under Bethlehem's contract with Steveco. *Id.* The storage facility was constructed in two phases ("Phase I and Phase II"). *Id.* Phase I commenced in early 2000 and ended on August 22, 2000, when the portion of the storage facility constructed during Phase I was opened for operation. *Id.* Phase II was completed in the fall of 2001. *Id.* at 2.

**1. Damaged Grapes**

On July 23, 2001, during Phase II of the project, a layer of white powder was discovered on 23,362 boxes of grapes being stored in a pre-

---

[5] Steveco is incorporated in and maintains its principal place of business in California. (Ct. Rec. 56-3 ¶ 5.)

ORDER ~ 10

cooling room constructed during Phase I. (Ct. Rec. 174 Ex. 1 at 1.) Prior to the discovery of the powder, the grapes had a wholesale market value of $350,337.00. *Id. Ex. 1 at 2.* The powder had a "paint-like feel and appearance, and since Bethlehem's painters had been present and working at the site for several days, grape shipments were halted and Bethlehem was contacted." *Id. Ex. 1 at 1.*

Bethlehem, as lead contractor, assumed the responsibility of determining the source of the powder. *Id.* Ex. 1 at 2. Bethlehem began its investigation by contacting Transportation on July 25, 2001, to report the grape damage as a claim under the Transportation Policies. *Id.* Ex. 3 at 2. That same day, Transportation, through an independent adjuster, commenced its own investigation of the mysterious white powder. *Id.* Bethlehem also hired Forensic Analytical to test several samples of the powder in an effort to determine its chemical makeup and source. *Id.* Ex. 1 at 1. On July 27, 2001, Forensic Analytical issued a report indicating the powder consisted of 9.01 % paint pigment and 29.73% aluminum corrosion. *Id.* A follow-up report contradicted the first report concerning the amount of paint pigment, but continued to indicate the presence of a high concentration of aluminum corrosion. *Id.* Due to the presence of the powder, the grapes were considered unfit for consumption or sale by Lucich Farms until clearance was given by a qualified laboratory for their use. *Id.* Ex. 1 at 2.

Because Lucich Farms had not completed a full inventory of the grapes on July 23, 2001, Transportation retained Greer & Kirby to complete an inspection and lot inventory. *Id.* Ex. 3 at 2. Greer & Kirby's inventory began on August 7, 2001, and concluded on August 9,

ORDER ~ 11

2001. *Id.* Upon completion of the inventory, Transportation claims it was told by Mike Ahumada of Lucich Farms that the grapes could be maintained as long as three months after the harvest. *Id.* At that time, Rob Staniford of Jim Buckley & Associates, Transportation's adjuster, informed Mr. Ahumada that Transportation would abide by the sale of any salvage, but would not accept liability until its investigation was complete. *Id.*

On August 23, 2001, thirty days after the mysterious white powder was discovered on the grapes, Associated Laboratories, a laboratory retained by Transportation, issued a report stating the grapes "were found to be fit for human consumption if properly and completely rinsed." *Id.* Ex. 1 at 2. However, by that time, the grapes had aged considerably, and their condition was too poor for normal sale and only $15,700.00 was received through a salvage sale. *Id.* The final grape-related loss totaled $334,637.00.

## 2. Construction Defects

In a letter dated October 5, 2001, Steveco provided Bethlehem with formal notice of certain Phase I construction defects Steveco and requested their repair. *Id.* Ex. 1 at 3-4. These defects included:

> (a) the concrete support beams for the refrigeration unit that have corrosion problems; (b) rusting black iron supports of the sprinkler system; (c) painting of rooms 3, 4, 7, 8 and the precooler; and (d) caulking of bunkers, specifically for leaks from room 5 to 7, and various leaks and open areas in the precooler.

*Id.*

Later on October 5, 2001, at Bethlehem's request, structural engineer and concrete consultant Robert E. Tobin inspected the concrete beams complained of by Steveco and prepared a report of his findings and

ORDER ~ 12

recommendations. (Ct. Rec. 197-4 at 8-15.)  In his report, Mr. Tobin described the damaged concrete beams as follows:

> The separate cooling systems consist of a network of horizontal aluminum refrigeration coils located near the roof.  These coils in turn are supported on precast reinforced concrete beams 6 in. wide and 12 in. deep that are mounted on the walls below the roof.  These concrete beams, which are the subject of this report, have developed areas where their surfaces have spalled or scaled to varying degrees.  The sides and the edges of some of these beams have scaled to varying degrees.  The sides and the edges of some of these beams have scaled to a depth of approximately 1/4 inch or more over an area generally not greater than one sq. ft.  It is estimated that only one beam in approximately 20 beams shows any visible signs of spalling.  It is further estimated that on those beams which have spalled, well below 10 percent of their surface area has been damaged.  At the time of this visit none of these beams appeared to have any cracking or structural damage.

*Id.* at 9.

Mr. Tobin also explained that because the storage facility's cooling rooms were intended to keep grapes just above 32 degrees Fahrenheit, the refrigeration coils must operate just below 32 degrees. *Id.* at 10.  As a consequence, water continually condensed on the refrigeration coils and later froze. *Id.*  To combat the ice problem, the refrigeration coils were sprayed twice a day with water warm enough to melt the ice. *Id.*  A considerable portion of that water flowed over the concrete beams used to support the refrigeration coils, causing them to become partially saturated with water on their outer surfaces. *Id.* The "internal moisture around the outer-surface of the beams [was] susceptible to freezing at the temperatures at which the [refrigeration coils operated]." *Id.*  Mr. Tobin then concluded the beams were likely damaged by the repeated cycle of freezing and thawing experienced near the beam ends connected to the refrigeration coils. *Id.*  To prevent future damage, Mr. Tobin recommended the application of a special epoxy paint to the concrete beams that would

seal out water and prevent freezing under the beams' surfaces. *Id.*  Mr. Tobin also explained that had the concrete used in the beams been air-entrained, the beams would not have been as susceptible to the freezing cycles experienced in the cooling rooms. *Id.* at 14-15.[6]

On November 2, 2001, at Bethlehem's request, Smith-Emory Laboratories produced a draft report in which it discussed what it believed caused the concrete beam damage. (Ct. Rec. 197-4 at 17-20.) Like Mr. Tobin, Smith-Emory Laboratories also believed the above-described freezing cycles, as well as exposure to certain chemicals caused the damage. *Id.*  Smith-Emory Laboratories also suggested several repair options, but ultimately concluded the only guaranteed long-term fix would be to replace the concrete beams with new beams constructed of materials resistant to the storage facility's environmental conditions. *Id.*

### 3. Steveco's Claims & Related Communications Between Bethlehem and Its Insurers

Sometime in the fall of 2001, Andrew Haut, a Bakersfield, California attorney retained by Bethlehem, requested an explanation from M. Randal Davies, Steveco's attorney, for why Steveco had not paid Bethlehem the remaining balance of fees owed under the construction contract for the Phase II work. *See Id.* Ex. 1.  In response, Mr. Davies, on behalf of Steveco, in the above-mentioned October 5, 2001, letter, detailed the grape damage and construction defects described above and implied Steveco

---

[6] Tests conducted by Ash Grove Cement Company confirmed the concrete used to construct the concrete beams was not air-entrained. (Ct. Rec. 197-4 at 16.)

ORDER ~ 14

would not pay Bethlehem the remaining amount due until the damages were accounted for. *Id.* With regard to Lucich Farms' grape loss, Steveco's letter specifically states:

> If Steveco had been promptly informed that Bethlehem and its insurer were not accepting responsibility, or that their salvage company and testing lab would delay several weeks before determining that the grapes were edible, then Steveco could have taken steps to avoid the loss. Thus, Steveco contends that Bethlehem *and its carrier* are liable for the loss of the grapes.

*Id.* Ex. 1 at 2-3 (emphasis added).

In a letter written on November 19, 2001, Mr. Haut, on behalf of Bethlehem, informed Transportation of Steveco's October 5, 2001, letter, noting Steveco's separate grape and construction defect claims. *Id.* Ex. 2. In his letter, Mr. Haut emphasized Bethlehem's perception of the grape loss by stating:

> What is unique about the claims of Steveco with respect to the alleged grape loss is that it is claiming Bethlehem's carriers and adjusters were directly negligent themselves and that the loss resulted partly or completely from this negligence.

*Id.* Ex. 2 at 2.

Because Bethlehem believed Steveco was making separate claims against both Bethlehem and Transportation for the grape loss, Bethlehem requested the appointment of independent *Cumis* counsel. *Id.* Ex. 2 at 2-3. In addition, Bethlehem informed Transportation Bethlehem was owed at least $791,513.16 by Steveco for construction work associated with the storage facility and that the funds were being withheld based on the grape and construction defect claims. *Id.* Ex. 2 at 3. Furthermore, Bethlehem expressed its belief Transportation owed Bethlehem a duty to (1) defend and indemnity, (2) reimburse the $791,513.16 withheld by Steveco, (3) provide legal counsel and cover costs associated with

1  Bethlehem's attempts to recover the $791,513.16 from Steveco, and (4)

2  promptly resolve Steveco's claims so as to minimize damages to Bethlehem.

3  *Id.* Ex. 2 at 3-4.

4      On December 5, 2001, Bobbie Jennings, a Transportation claim

5  specialist, responded to Bethlehem's November 19, 2001, letter. *Id.* Ex.

6  3.  Through Ms. Jennings, Transportation stated:

7          Please be advised the investigation of the [Steveco claim] has
            revealed there had been no substantiation of contamination [of
8          the grapes] resulting from the insured activity or their
            subcontractors.  The claimant bears the responsibility for
9          determining that source of the defect.

10 *Id.* Ex. 3 at 1.  Transportation then contended the powder found on the

11 grapes stemmed from defects associated with the refrigeration coils

12 installed by subcontractors CalCA and Porterville Electric Company. *Id.*

13 Transportation also dismissed earlier claims that Bethlehem's painting

14 subcontractor's contributed to the powder's accumulation. *Id.*

15 Furthermore, Transportation expressed its belief Bethlehem and Steveco

16 were pursuing an independent resolution to the beam damage referenced in

17 the November 19, 2001, letter. Id. Ex. 3 at 2.  The December 5, 2001,

18 letter closed with Transportation impliedly denying any obligation to

19 reimburse Bethlehem for the $791,513.16 withheld by Steveco. *Id.*

20     In January 2002, Bethlehem and Steveco engaged in settlement

21 negotiations in which Bethlehem offered to (1) replace fifteen of Phase

22 I's 127 concrete beams with stainless steel beams; (2) dry and coat the

23 remaining Phase I beams with a special coal tar pitch designed to seal

24 moisture out of the beams; (3) complete several non-controversial

25 repairs; (4) warrant the concrete beams would be free from defects for

26 five years; and (5) cooperate with Steveco, consistent with its

obligations as an insured, to seek full recovery from Bethlehem's insurance carriers for both the repair work and the grape losses. (Ct. Rec. 197-4 at 54-55.)  In return, Bethlehem asked Steveco to (a) release Bethlehem from liability from the Phase I defects; (b) not hold Bethlehem financially responsible for grape losses not covered by insurance proceeds; (c) pay Bethlehem the unpaid balance due on the Phase II construction ($680,388.18) plus interest ($47,345.79) and the remaining money due from Phase I ($10,771.00) minus a hold back of $100,000.00, which would be placed in an interest bearing account and released upon completion of the beam repairs. *Id.*

In response to Bethlehem's initial offer, Steveco proposed a counteroffer, under which Bethlehem would: (1) replace thirty-three Phase I concrete beams with new stainless steel beams; (2) replace all mounting brackets, which were rusting, with new stainless steel brackets; (3) repair any damage, included cosmetic damage, caused by the rusting brackets; (4) agree to replace all deteriorating Phase I and II beams in ensuing years, unless and until a satisfactory method of repair is identified, which did not include the coal tar pitch coating suggested by Bethlehem; (5) provide a five-year warranty of the repair work; (6) remain liable for up to $150,000.00 in grape losses not covered by insurance proceeds; and (7) release its mechanics lien against Steveco. *Id.* In return, Steveco would agree to pay Bethlehem the money owed under the parties' construction contract, absent interest, which Steveco believed Bethlehem should waive, subject to a hold back equivalent to 150% of the estimated cost of repairs, plus $150,000. *Id.* The hold back would be released upon resolution of the grapes claim. *Id.*

ORDER ~ 17

The substance of the above-described offer and counteroffer were forwarded by Bethlehem to Mr. Zimmerman, Bethlehem's insurance agent, on January 25, 2002, with a request that the information be passed along to "the adjusters for the insurers . . . ." (Ct. Rec. 82-8 at 18-19.) Bethlehem also informed Mr. Zimmerman it had rejected Steveco's counteroffer and was busy preparing a new offer of its own. *Id.* Furthermore, Bethlehem also stated:

> Please get this information to the adjusters for both of the carriers immediately, and explain to them that, while Bethlehem is willing to work with and cooperate with the carriers, there will come a time when Bethlehem will be unable to wait any longer, and simply must take action. That time is rapidly approaching. If the insurers intend to demonstrate any commitment whatsoever to a good faith response to this situation, they should notify Bethlehem . . . immediately and get out to view the damage. Otherwise, Bethlehem will construe their lack of action in this action as an implicit denial of coverage, and it will proceed accordingly.

*Id.* at 19.

On January 23, 2002, subsequent to Bethlehem's initial attempt to settle with Steveco, Bethlehem provided its first notice to St. Paul of Steveco's construction defect claims. (Ct. Rec. 197-6 ¶ 7.) In a letter dated January 30, 2002, St. Paul acknowledged the Steveco claim and informed Bethlehem it had not received sufficient information to determine whether coverage under the St. Paul policy had been triggered and reserved its right to deny coverage under the policy. *Id.* at 9-11. St. Paul then requested Bethlehem provided various documents necessary to its investigation. *See Id.*

On January 30, 2002, Steveco filed a complaint against Bethlehem, Engel & Company, and CalCA in the Kern County Superior Court of California. (Ct. Rec. 174 Ex. 5 at 4-17.) In its complaint, Steveco

alleged Bethlehem, in addition to the other defendants, was liable for breach of contract and negligence, which resulted in its grape loss and various construction defects. *Id.*  In response, Bethlehem filed a counterclaim against Steveco regarding Steveco's nonpayment of funds owed under the Lucich Farms construction contract.  On February 19, 2002, Bethlehem faxed copies of both Steveco's complaint and its counterclaim to Mr. Zimmerman requesting they be transmitted to Transportation, but not St. Paul. (Ct. Rec. 174 Ex. 5 at 2.)  In this fax, Bethlehem explains no answer had been filed by Bethlehem and that it considered the fax to Mr. Zimmerman as a "tender of defense" to Transportation. *Id.*

On March 4, 2002, because documents previously requested of Bethlehem by St. Paul had not yet been received, St. Paul sent Bethlehem a follow-up letter to its January 30, 2002, document request, which specifically asked for a "complete copy" of Bethlehem's construction file. (Ct. Rec. 197-6 at 15-18.)  In addition, St. Paul informed Bethlehem that (1) the damaged grapes were not covered by the St. Paul policy and (2) the damaged beams would not be covered if the damage was caused by Bethlehem's subcontractors. *Id.*  St. Paul also discussed its perceived duty to defend Bethlehem against Steveco's grape and beams claims by stating:

> It is our understanding that you have [ ] reported [the grape and beams claims] to your General Liability Carrier, CNA, and have asked them to provide a defense, and they have agreed to do so.  We would like to point out that under the insuring agreements on your CGL Gap Policy the underwriters do not have the duty to defend if you are entitled to a defense or indemnification of defense costs under any other policy.

*Id.* at 16.  For that reason, St. Paul informed Bethlehem that "if CNA provides a defense, then [St. Paul] will not." *Id.* at 17.

ORDER ~ 19

In a March 5, 2002, letter to Transportation and St. Paul, Bethlehem advised the carriers of the above-described settlement negotiations it was engaged in with Steveco, disclosing the terms of the most recent proposal made by Bethlehem. (Ct. Rec. 174 at Ex. 6.)  In this letter, Bethlehem urged the carriers to involve themselves in the negotiations, expressing a "fear" the ultimate repair decisions will have to made without their input unless they acted promptly. *Id.*  On March 11, 2002, in response to Bethlehem's March 5, 2002, letter, Transportation reaffirmed its position that Bethlehem was not liable for the grape damage and encouraged Bethlehem to advise Transportation "if and when Bethlehem Construction [was] served with a lawsuit, at which time [Transportation would] send [the] claim to defense counsel to defend." *Id.* at Ex. 7.

On March 15, 2002, Bethlehem informed Transportation and St. Paul of Steveco's rejection of the settlement offer referenced in its March 5, 2002, letter and Steveco's subsequent counteroffer, under which (1) Steveco would either pay a separate construction company $200,000.00 to repair the Phase I concrete beams by replacing them with stainless steel beams or have Bethlehem perform the work at an estimated cost of $143,584.00; (2) Bethlehem would pay for the cost of temporarily removing the refrigeration coils and their reinstallation at the conclusion of the beam repair work ($75,000.00); and (3) Bethlehem would treat all Phase II beams with a protective coating of Xypex at a cost of $72,987.00, with a five-year warranty on the Phase II repairs.  Once the beam repairs are complete, Steveco would pay Bethlehem $475,000.00, which was substantially less than the $743,115.94 owed (as of March 15, 2002) to

Bethlehem by Steveco for the storage facility's construction. (Ct. Rec. 174 Ex. 8.) The reduced payment was the result of deducting $175,000.00 for one half of the claimed grape damage, $50,000.00 for the attorneys' fees and expert costs incurred by Steveco to date, and $43,115.94 in interest Steveco refused to pay on the amount owed to Bethlehem. *Id.*

Near the close of its March 15, 2002, letter, Bethlehem stated:

> Bethlehem is in the position where it must either accept or reject this settlement offer "very quickly." No specific termination date for the offer was mentioned, but I anticipate the offer will be withdrawn on March 18 or 19, 2002, at the latest. Bethlehem simply cannot afford to sustain the kind of loss that this offer pencils out to be. If those carriers willing to accept some responsibility for the damage to the beams and grapes are interested in seeing this matter settled, they may wish to consider making an offer to Bethlehem to help get this settled.

*Id.* The March 15, 2002, letter ended with Bethlehem explaining that if the carriers "are unwilling to help finance a settlement along [Steveco's] lines, feel free to disregard the foregoing, and Bethlehem will reject the offer." *Id.*

On March 19, 2002, St. Paul responded to Bethlehem's March 15, 2002, letter by indicating it could not provide a definitive response regarding coverage because the materials originally requested on January 30, 2002, and again on March 4, 2002, had not been received nor reviewed to determine whether coverage existed under the St. Paul Policy for the claimed damages. (Ct. Rec. 197-6 at 22-33.) On March 29, 2002, Bethlehem's Senior Administrative Assistant Kathy Porrovecchio responded to St. Paul's March 4, 2002, document request by forwarding St. Paul various construction files and a copy of Steveco's January 30, 2002, Complaint for Damages, Bethlehem's February 13, 2002, Cross-Complaint, and the Summons Mr. Haut had received on Bethlehem's behalf in connection

1   with the Steveco action on March 13, 2002. *Id.* at 24-25. Bethlehem

2   supplemented this disclosure on April 30, 2002. *Id.* at 26-27.

3       Sometime in the Spring of 2002, Steveco contracted with Bethlehem

4   for the replacement of all 127 Phase I concrete beams with stainless

5   steel beams. (Ct. Rec. 190 Exs. 13 & 14.) Bethlehem allegedly entered

6   into this contract when Steveco threatened to employ a different

7   contractor to perform the work for a higher price. *Id.* Approximately,

8   $51,000.00 of the beam replacement was paid by Steveco to Bethlehem,

9   while the remaining $118,000.00 owed under the beam replacement contract

10   was withheld by Steveco because the steel beams were defectively

11   installed. *Id.* Ex. 16.

12       Steveco filed an amended complaint in the Kern County Superior Court

13   of California on April 26, 2002. (Ct. Rec. 174 Ex. 10.) This document

14   and the accompanying summons were forwarded to Transportation and St.

15   Paul by Bethlehem on May 17, 2002, with a letter stating: "Defense

16   efforts will now proceed in earnest. Please advise immediately if you

17   intend to voluntarily help fund the defense." *Id.* at Ex. 11. On May 29,

18   2002, St. Paul sought confirmation from Transportation on whether

19   Transportation would be providing Bethlehem with a defense in the

20   underlying Steveco action. (Ct. Rec. 197-6 at 31-32.)

21       On July 22, 2002, in a letter written by Sandy Marcy, Transportation

22   acknowledged its receipt of the summons and complaint received by

23   Bethlehem on March 13, 2002, concerning the Steveco action. (Ct. Rec. 174

24   Ex. 12.) In this letter, Transportation confirmed the appointment of Dan

25   Crowley of Booth, Mitchel & Strange ("BMS") as defense counsel

26   responsible for defending Bethlehem against Steveco's grape and beam

damage claims, but explained BMS would play no role in prosecuting Bethlehem's counterclaim against Steveco. *Id.* Ex. 12 at 1.

In addition, in the July 22, 2002, letter, Transportation asked Bethlehem to fully cooperate with any requests made of it in the course of handling Bethlehem's defense against Steveco. *Id.* Furthermore, because Steveco's Complaint for Damages contained an unspecified damage amount, which may exceed the Transportation policy's coverage limit, Bethlehem was advised of the benefit of obtaining separate counsel, at Bethlehem's own expense, to protect Bethlehem's interests over and above the Transportation policy's coverage limit. *Id.* Transportation also recited several policy exclusions included in the Transportation policy and reported it may seek contribution from Bethlehem towards a future settlement and defense costs if Steveco's alleged damages were caused by an excluded risk ("reservation of rights"). *Id.* Ex. 12 at 2-3.

On August 16, 2002, Joel McCormick, Bethlehem's independently retained attorney for the Steveco action, sent a letter to Mr. Crowley of BMS, expressing Bethlehem's interest in determining whether *Cumis* counsel would be paid for by Transportation. (Ct. Rec. 174 Ex. 15.) Thereafter, on August 30, 2002, in a second letter to Mr. Crowley, Mr. McCormick again touched upon the issue of *Cumis* counsel and sought to confirm the substance of a conversation held between the two parties on August 26, 2002. *Id.* Ex. 14. In his second letter, Mr. McCormick acknowledged Transportation's position that legal representation would not be provided for Bethlehem's affirmative claims against Steveco and that Bethlehem owes Transportation a duty of cooperation. *Id.*

1  Furthermore, Mr. McCormick wrote:

2      Bethlehem's insurance policy contemplates Bethlehem will be
       reimbursed for its costs and expenses that it incurs at the
3      request of CNA. By this letter, I want to simply memorialize
       the fact that Bethlehem will treat any communication from you,
4      or requests for assistance from you, as if it was a request
       made by CNA as contemplated in the supplemental payments
5      portion of Bethlehem's insurance policy.

6      I would appreciate it if you would simply confirm with CNA its
       willingness to honor this understanding. Is such is not the
7      case, if CNA does not stand behind you, and if CNA expects
       Bethlehem to bear the cost of either having its employees work
8      in the service of your effort to prepare a defense, I trust CNA
       or you will so advise me in writing. Bethlehem would, of
9      course, take exception to such a stance by CNA.

10 *Id.* Neither Mr. Crowley nor Transportation ever responded to Mr.

11 McCormick's August 30, 2002, letter. (Ct. Rec. 247 ¶ 7.)

12      On September 13, 2002, Mr. Crowley forwarded Mr. McCormick's August

13 16, 2002, and August 30, 2002, letters addressing *Cumis* counsel to

14 Transportation. *Id.* Ex. 109.  At that time, Mr. Crowley recommended

15 Transportation

16      retain its own coverage counsel to represent its interests in
       [the Steveco] matter as soon as possible. Mr. McCormick keeps
17      directing inquiries to me regarding "CNA's position" on various
       topics, and I sense that he is growing weary of my response
18      that I cannot address those.

19 *Id.*

20      On September 12, 2002, in a letter to Mr. McCormick, St. Paul

21 expressed its belief Transportation was providing Bethlehem with a

22 defense in the Steveco action and requested Bethlehem provide status

23 reports concerning the litigation as the case proceeded forward. (Ct.

24 Rec. 279 at 3.)  Bethlehem responded in a letter written on October 8,

25 2002, stating:

26

ORDER ~ 24

> You are correct in understanding that CNA has indicated it will provide a defense for Bethlehem Construction, Inc. ("Bethlehem"). However, to date CNA has still not reimbursed Bethlehem for any of Bethlehem's defense costs incurred prior to CNA's hiring of defense counsel. Perhaps CNA will pay those monies one day. Perhaps not.
>
> CNA has to date refused to engage *Cumis* counsel. CNA has to date refused to reimburse Bethlehem for the cost of its affirmative efforts to recover monies being withheld by Steveco based upon Steveco's contention that Bethlehem was negligent. And finally, counsel engaged by CNA to defend Bethlehem has, as recently as yesterday, been given no instruction that its sole and exclusive duties are to Bethlehem, as would be required under the Washington formulation of the duties of retained counsel, as I understand things. Rather, engaged counsel is proceeding with the understanding that its duties are to CNA and to Bethlehem are governed by the California formulation, which I understand involves retained counsel owing duties to both the insured and the insurer that are almost coequal. CNA takes the position that it can manage the defense in this manner because there is "no conflict of interest." Bethlehem disagrees, contenting there exists an actual conflict of interest between the interests of CNA and Bethlehem.
>
> Based upon the foregoing, you will not be surprised to learn that Bethlehem contends it has not received the "unconditional defense" you mentioned whereupon CNA is "paying all defense costs." Consequently, you may fairly conclude that the St. Paul Reinsurance Company's argument that Bethlehem is disqualified from defense coverage because Bethlehem has available to it "other valid and collectible defense coverage" is seriously disputed by Bethlehem.

*Id.* at 5-6.

In late 2002 and early 2003, Bethlehem, Bethlehem's insurance carriers, Steveco, and CalCA engaged in mediation discussions that ultimately resulted in a February 24, 2003, global settlement of Steveco's and Bethlehem's claims. (Ct. Rec. 174 Ex. 18.) Under the global settlement agreement, Steveco was to be paid $340,000.00 by Transportation, $65,000.00 by St. Paul, $65,000.00 by Evanston,[7]

---

[7] On April 21, 2004, the Court granted Evanston's Motion for Judgment on the Pleadings. (Ct. Rec. 28.) As a result, Evanston was

ORDER ~ 25

$30,000.00 by Engel & Company, and $30,000.00 by CalCA to satisfy the grape and beam damage claims.  In turn, Steveco was to pay $675,000.00 to Bethlehem in consideration for BCI's Phase II work and the steel beam replacements. *Id.*

**C. Bethlehem's Claims Against Transportation & St. Paul**

On March 4, 2003, Bethlehem filed suit in the Chelan County Superior Court of Washington against Transportation and St. Paul, alleging the insurance carriers breached their insurance contracts and acted in bad faith in connection with the underlying Steveco action. (Ct. Rec. 1 at 3-15.)   Specifically, Bethlehem alleged Defendants breached their insurance contracts and acted in bad faith by failing to properly defend, investigate, indemnify, and communicate coverage positions throughout the course of the Steveco action. *Id.*  As a result, Bethlehem claims it was forced to retain its own defense counsel, which caused it to incur litigation fees and costs allegedly covered by the Transportation and St. Paul Policies. *Id.*  To remedy Defendants' alleged misconduct, Bethlehem sought the recovery of (1) defense fees and costs associated with the underlying Steveco action; (2) defense fees and costs associated with litigating this action; (3) prejudgment interest; (4) punitive damages; and (5) damages under Washington's Consumer Protection Act. *Id.*  In addition, Bethlehem hoped to recover funds allegedly owed to it by Steveco that Bethlehem claims it was compelled by Transportation and St. Paul to forego payment of as part the global settlement agreement. *Id.* The Chelan County Superior Court case was removed to the Eastern District

dismissed from this action. *Id.*

ORDER ~ 26

of Washington and assigned to this Court on September 11, 2003. (Ct. Rec. 1.)

## II. Standard of Review

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id*. at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id.* There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248. This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any

challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

### III. Bethlehem's Conflict of Law Motion

"A federal court sitting in diversity must apply the forum state's choice of law rules." *Jorgensen v. Cassidy*, 320 F.3d 906, 913 (9th Cir. 2003) (citing *Klaxon Co. v. Stentor Elc. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  Under Washington's choice of law rules, the law of the forum is presumed to control. *Burnside v. Simpson Paper Co.*, 123 Wash. 2d 93, 100-01 (1994) (citation omitted).  Washington courts depart from this approach when a relevant actual conflict of law is found to exist between the laws of Washington and another state, in which case, a conflict of law analysis is conducted to determine which state's law governs the issue in conflict. *Id.*  An actual conflict exists when the result of an issue would be different under the conflicting states' laws. *Id.* (citing *Pac. Gamble Robinson Co. v. Lapp*, 95 Wash. 2d 341, 344-45 (1980)).

For the above-stated reasons, because Washington is the forum state for this action, Washington law presumptively applies to all issues raised in this case, unless a relevant actual conflict is found to exist between Washington law and that of another state.  If a relevant actual conflict is found to exist, the Court will engage in a conflict of law analysis to determine which state's law governs a particular issue.

Thus, the Court's consideration of Bethlehem's Conflict of Law Motion commences with a consideration of whether actual conflicts exist between Washington and California law with regard to the three issues raised by Plaintiff.  Then, should the Court determine an actual conflict does exist on a particular issue, it will engage in a conflict of law analysis to determine which state's law controls the issue in conflict.

**A. Prejudgment Interest**

Bethlehem first moves the Court for summary judgment on the issue of whether it may collect prejudgment interest on unliquidated damages should it prevail on the merits of its breach of contract and bad faith claims against Defendants.  In support of this request, Bethlehem asserts that California law controls prejudgment interest issues in this case and that it is entitled to prejudgment interest on its unliquidated damage claims because California law allegedly permits the recovery of such interest on unliquidated damages caused by contract breaches and bad faith.

Transportation disagrees with both theories of prejudgment interest recovery asserted by Bethlehem and argues that Washington law, and not California law, governs the prejudgment interest issues raised by Bethlehem.  In contrast, St. Paul concedes that in limited circumstances, California law permits the recovery of prejudgment interest on contract-based unliquidated damages, but like Transportation, argues California law does not apply in this instance and that Bethlehem's prejudgment interest requests must be denied under Washington law, which St. Paul also believes governs this issue.

ORDER ~ 29

Despite their disagreements, the parties do agree that Washington law *does not* permit the recovery of prejudgment interest on unliquidated damages in any situation. *Accord Prier v. Refrigeration Eng'g Co.*, 74 Wash. 2d 25, 32 (1968); *Litho Color, Inc. v. Pac. Employers Ins.*, 98 Wash. App. 286, 300-01(1999); *Kiewitt-Grice v. State*, 77 Wash. App. 867, 872-73 (1995). Thus, the Court's task is limited to determining (1) whether prejudgment interest is available on unliquidated damages stemming from (a) contract-based and (b) bad faith claims under California law; and (2) which state's law, i.e. Washington or California, controls this case's prejudgment interest issues.

### 1. Prejudgment Interest on Contract-Based Unliquidated Damages

As required by Washington's choice of law rules, the Court first considers whether an actual conflict exists between Washington and California law on the issue of whether prejudgment interest may be awarded on unliquidated damages caused by a defendant's breach of a contract. *Burnside*, 123 Wash. 2d at 100-01. If an actual conflict does exist, the Court then conducts a conflict of law analysis to determine which state's law applies to the issue. *Id.*

### a. Actual Conflict Analysis

California Civil Code § 3287 states:

(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . .

(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.

Thus, even though prejudgment interest is not typically permitted in California on unliquidated damages under § 3287(a), the California Legislature has created a limited exception in § 3287(b) for prejudgment interest of contract-based unliquidated damages. *Lewis C. Nelson & Sons v. Clovis Unified Sch. Dist.*, 90 Cal. App. 4th 64, 69 (2001) ("The addition of subdivision (b) created a limited exception to the prevailing general rule that prejudgment interest is not allowed on unliquidated obligations."). Accordingly, in California, a prevailing plaintiff in a breach of contract case may recover prejudgment interest on unliquidated damages caused by the defendant's breach of the parties' contract. *Id.* § 3287(b). The period of time for which prejudgment interest is available is within the discretion of the court, but may not precede the date on which the plaintiff filed its action against the defendant. *Id.*

Because Bethlehem is not entitled to prejudgment interest on its contract-based unliquidated damages under Washington law, *see Prier*, 74 Wash. 2d at 32, the Court concludes a real conflict exists between Washington and California law with regard to the availability of prejudgment interest to Bethlehem on its contract-based unliquidated damage claims. For this reason, the Court must engage in a conflict of law analysis to determine which state's law controls this issue. *Burnside*, 123 Wash. 2d at 100-01. Should the Court determine California law governs this issue, the Court could award prejudgment interest on any unliquidated contract-based damages awarded to Bethlehem should it find the award of prejudgment interest "reasonable in light of the factual circumstances of [the] case . . . ." *Lewis C. Nelson & Sons*, 65 Cal. App.

4th at 829; CAL. CIV. CODE § 3287(b). However, should the Court exercise its discretion to award prejudgment interest on any contract-based unliquidated damages, the furthest back an award of such prejudgment interest could extend would be March 4, 2003, the date Bethlehem filed this suit in state court. *See* CAL. CIV. CODE § 3287(b) ("in no event [may prejudgment interest on contract-based unliquidated damages be awarded] earlier than the date the action was filed).

In rendering this decision, the Court has considered Transportation's request that § 3287(b) not be applied due to the lack of guiding California case law on the subsection's meaning. (See Ct. Rec. 62-1 at 9.) This argument is unpersuasive. The California legislature enacted § 3287(b) with the expectation it would be recognized and implemented by all courts having jurisdiction to hear claims it applies to. Should this Court grant Transportation's request, the California legislature's purpose for the subsection would be circumvented. In addition, there is no legal basis cited, nor found by this Court, for granting Transportation's request. If a federal court were allowed to apply a state law only after state courts have addressed the law and provided guidance on how the state law should be understood and applied, the federal judiciary's ability to effectively consider and manage diversity and supplemental claims would be severely compromised. Accordingly, Transportation's request that § 3287(b) not be applied is denied.

### b. Conflict of Law Analysis

In the absence of an effective choice of law provision agreed to by the parties, Washington courts apply the "most significant relationship

rule" to determine which state's law applies when an actual conflict relating to a contract issue exists between two states' laws. *Barr v. Interbay Citizens Bank of Tampa*, 96 Wash. 2d 692, 697 (1981); *Potlatch No. 1 Fed. Credit Union v. Kennedy*, 76 Wash. 2d 806, 809 (1969); *Dairyland Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 41 Wash. App. 26, 30 (1985) (citing Restatement (Second) of Conflicts of Laws §§ 6, 145, and 188 (1971)). Under this rule, "the validity and effect of a contract is governed by the law of the state which has the most significant relationship to the contract." *Potlatch No. 1 Fed. Credit Union*, 76 Wash. 2d at 809.

Applying the most significant relationship rule to a conflict of law relating to a contract issue requires a two-step analysis. *Barr*, 96 Wash. 2d at 697; *Dairyland Ins. Co.,* 41 Wash. App. at 30. In the first step, the Court evaluates the nature of contacts the parties and contract have with the conflicting jurisdictions. *Id.; see generally* Restatement (Second) of Conflict of Laws § 188. When doing so, the most important contacts to be considered are:

        (a) the place of contracting,
        (b) the place of negotiation of the contract,
        (c) the place of performance,
        (d) the location of the subject mater of the contract, and
        (e) the domicil, residence, nationality, place of incorporation
        and place of business of the parties.

*Dairyland Ins. Co.,* 41 Wash. App. at 31 (quoting Restatement (Second) of Conflict of Laws § 188(2)). Despite the primary importance of these contacts, one state's law does not control simply because that state has more of these contacts with the parties and contract than the other state has. *Id.* ("The most significant relationship test does not involve simply counting contacts.").

ORDER ~ 33

Instead, a court must complete the second conflict of law analysis step and "consider the competing policies and interests of the two states with respect to application of their laws." *Spider Staging Co.*, 87 Wash. 2d at 581; *Dairyland Ins. Co.*, 41 Wash. App. at 31 (citing *Potlatch No. 1 Fed. Credit Union*, 76 Wash. 2d at 810-11; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)). This is done by addressing the competing policies and interests of the conflicting states in light of the contacts addressed in the first step. When implementing the second step, courts should consider:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2); *Barr*, 96 Wash. 2d at 697;

Following the second step, based on its consideration of the step one contacts and the states' relative interests in having their law applied, the court must determine which state has the most significant relationship to the contract-based issue in question and then, apply that state's law to the issue in conflict.

In this instance, due to the contract-based nature of this issue and the fact that none of the insurance policies in question have choice of law provisions, the Court applies the two-step most significant relationship analysis described above to determine which state's law, Washington or California, controls the recoverability of prejudgment

ORDER ~ 34

interest on unliquidated damages caused by Defendants' purported breach of contract.

### i. Step One: Consideration of Contacts

Washington's contacts with the parties in this action and the insurance contracts in questions include: (1) the insurance policies were entered into in Washington through Mr. Zimmerman, a Washington insurance broker; (2) the policies covered projects Bethlehem was associated with in Washington; and (3) Bethlehem is incorporated and maintains its principal place of business in Washington. California's contacts include: (1) in addition to Washington projects, the insurance policies covered the work being performed at the Lucich Farms work site in California; and (2) Bethlehem maintains an office in California. In addition, the Court notes that neither Defendant is incorporated in or maintain its principal place of business in California.

### ii. Step Two: Competing Interests & Policies

The California Court of Appeal has explained that § 3287(b),

> [b]y allowing an award of prejudgment interest, but only for a limited time period and only if the trial court finds it reasonable in light of the factual circumstances of a particular case . . ., seeks to balance the concern for fairness to the debtor against the concern for full compensation to the wronged party.

*Lewis C. Nelson & Sons*, 90 Cal. App. 4th 64, 69 (2001) (citing *Wisper Corp. v. Cal. Commerce Bank*, 49 Cal. App. 4th 948, 960 (1996) & *Togova Enters., Inc.*, 149 Cal. App. 3d at 906-07)). This discussion of § 3287(b) emphasizes California's interest in fully compensating parties damaged by a breach of contract when doing so would be fair to the party who breached the contract. By providing the trial court with discretion

ORDER ~ 35

to permit prejudgment interest on unliquidated contract-based damages, California has limited the award of prejudgment interest to cases in which the award would achieve its interest in full compensation to the damaged parties and a deterrence of those who consider breaching contracts because they face the potential of such an award.  This deterrent encourages contractual reliance and stability for those engaged in business in California.  As such, it is in sharp contrast to Washington's approach which protects its citizens from the possibility of an award of prejudgment interest on unliquidated damages they were unable to predict or plan for. *See generally Prier*, 74 Wash. 2d at 32-35.

### iii. Most Significant Relationship Analysis

After considering the parties' and the insurance contracts' respective contacts with Washington and California and the states' varied interests in having their laws applied on this issue, the Court concludes California has the most significant relationship to the issue of whether prejudgment interest is recoverable on unliquidated contract-based damages and grants Bethlehem's Conflict of Law Motion to this extent.

Although none of the parties are incorporated in California, they each operate within California by either engaging in construction projects or insuring risks found there.  In addition, the contractual obligations Bethlehem claims were breached in this action related to the Steveco case, which arose in and was being litigated in California.  For these reasons, the Court believes California's interest in fully compensating Bethlehem and encouraging adherence to the parties' contractual responsibilities under the insurance policies, trump

///

ORDER ~ 36

Washington's interest in protecting Defendants, neither of which are Washington corporations, from unpredictable prejudgment interest awards.

### 2. Prejudgment Interest on Unliquidated Damages & Attorneys' Fees Caused by Bad Faith: No Actual Conflict

Bethlehem also asserts that California law provides for the recovery of prejudgment interest on unliquidated damages and attorneys' fees caused by an insurer's bad faith. According to Bethlehem, because this policy conflicts with Washington's absolute bar on prejudgment interest on unliquidated damages, an actual conflict exists between the two states' laws and a conflict of law analysis must be conducted on this issue. Transportation argues that no conflict exists between Washington and California law on this issue and that even if one does, Washington law governs.

Bethlehem's position is premised on the general rule that insurance companies that act in bad faith are obligated to compensate their insureds for *all detriment* caused by the insurers' bad faith conduct. Bethlehem asserts "all detriment" includes prejudgment interest on the unliquidated damages and attorneys' fees caused by the bad faith. In support of this position, Bethlehem directs the Court to *Neal v. Farmers Ins. Exchange*, 21 Cal. 3d 910, 922 (1978), and *Johansen v. Cal. State Auto. Ass'n, Inter-Ins. Bureau*, 15 Cal. 3d 9, 15 (1975). Further, Bethlehem cites the rulings in *Municipal Court v. Bloodgood*, 137 Cal. App. 3d 29 (1982), and *Trope v. Katz*, 11 Cal. 4th 274 (1995), as support for its theory prejudgment interest is available on unliquidated damages and attorneys' fees caused by insurer bad faith under California law.

Transportation counters Bethlehem's argument by emphasizing that neither the court in *Neal* nor the court in *Johansen* considered or ruled

on the issue now presented by Bethlehem, i.e. whether prejudgment interest is permitted on unliquidated damages and attorneys' fees caused by bad faith conduct.   In addition, Transportation contends that the ruling in *Bloodgood* has no bearing on this case because *Bloodgood* dealt with the issue of whether prejudgment interest on attorneys' fees was available under a statutory provision no longer in effect and otherwise inapplicable to this case.   Lastly, Transportation explains that the *Trope* opinion is immaterial because it does not address the issue of bad faith damages or prejudgment interest on such damages.   In sum, based on Bethlehem's purported failure to support its theory with recognized authority, Transportation urges the Court to find prejudgment interest is not available on unliquidated damages or attorneys' fees caused by an insurer's bad faith conduct.

After reviewing the cases cited by Bethlehem and considering the parties' arguments, the Court concludes California law does not provide for the recovery of prejudgment interest on unliquidated damages or attorneys' fees caused by an insurer's bad faith conduct.   Although the California Supreme Court in *Neal* and *Johansen* loosely explained that an insurer is liable to an insured for all detriment proximately caused by its insurer's bad faith conduct, nothing in these opinions expressly states that prejudgment interest on unliquidated damages or attorneys' fees is included in this broad pool of relief. *See Neal*, 21 Cal. 3d at 922 ("For the breach of an obligation not arising from contract, the measure of damages, *except where otherwise expressly provided by this code*, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or

ORDER ~ 38

1  not."); *Johansen,* 15 Cal. 3d at 15 (The defendant is "liable to pay

2  compensatory damages for all detriment proximately caused by [its]

3  breach" of the duty of good faith.)  In fact, prejudgment interest was

4  never mentioned or discussed in either of these opinions. *Id.*

5  Furthermore neither *Bloodgood* nor *Trope* address the issue of whether

6  prejudgment interest is available on unliquidated damages or attorneys'

7  fees caused by bad faith conduct. *See Bloodgood*, 137 Cal. App. 3d at 29;

8  *Trope*, 11 Cal. 4th at 274.

9      California Civil Code § 3333, which was cited by the California

10  Supreme Court in *Neal*, states:

> For the breach of an obligation not arising from contract, the
> measure of damages, *except where otherwise expressly provided
> by this code*, is the amount which will compensate for all the
> detriment proximately caused thereby, whether it could have
> been anticipated or not.

14  (emphasis added).  When this statute is considered in the abstract, the

15  conclusion that prejudgment interest on unliquidated damages caused by

16  a breach of the duty of good faith and fair dealing might seem a

17  reasonable interpretation.  However, once § 3333 is considered in

18  connection with § 3287 of the California Civil Code, which outlines the

19  instances when prejudgment interest is available, i.e. on liquidated

20  damages and unliquidated contract-based damages, it is evident the

21  California Legislature did not intend for an insured, such as Bethlehem,

22  to recover prejudgment interest on unliquidated damages or attorneys'

23  fees caused by bad faith conduct.  For this reason and because Plaintiff

24  has failed to cite any on-point authority to the contrary, the Court

25  rejects Plaintiff's argument on this issue and finds Bethlehem can not

26  recover prejudgment interest on unliquidated damages and attorneys' fees

ORDER ~ 39

1  arising from bad faith conduct should Bethlehem prevail against

2  Defendants on its bad faith claims.  As a consequence, the Court finds

3  no actual conflict between Washington and California law on this issue.

4  Thus, no conflict of law analysis need be conducted on this issue.

5  **B. Appointment of *Cumis* Counsel**

6      While the parties agree that under Washington law Bethlehem was not

7  entitled to the appointment of independent counsel selected by Bethlehem,

8  but paid for by Transportation in the underlying Steveco, they disagree

9  on the issue of whether Bethlehem was entitled to independent counsel

10 under California law.  Furthermore, the parties disagree as to whether

11 Washington or California law ultimately governs this issue.  Bethlehem

12 sets forth two theories under which it believes California law required

13 the appointment of independent counsel.[8]  These theories, as well as the

14 pertinent conflict of law issues set forth in the parties pleadings, are

15 separately addressed below.

16     **1. Bethlehem's Reservation of Rights Claim**

17     In a letter to Bethlehem dated July 22, 2002, Transportation

18 acknowledged receipt of the complaint served on Bethlehem in the

19 underlying Steveco action and advised that Transportation had retained

20 Dan Crowley of Booth, Mitchel & Strange to defend Bethlehem against

21 Steveco's construction defect and grape loss claims. (Ct. Rec. 174 Ex.

22 12 at 1.)  Transportation also noted several policy coverage exclusions

23 and explained that Transportation might seek contribution from Bethlehem

24 _____

25     [8] (1) Transportation's reservation of rights on Steveco's

26 construction defect claims and (2) Transportation's purported independent

liability for the grape loss.

ORDER ~ 40

on any settlement related to damages not covered by the Transportation Policies and/or withdraw its contribution to Bethlehem's defense costs if it is later determined that the damages in question were not covered by the Transportation Policies. *Id.* Ex. 1 at 3.  Specifically excluded from coverage under the policies was "property damage" to Bethlehem's "work", unless the "damaged work or the work out of which the damages [arose] was performed on [Bethlehem's] behalf by a subcontractor." (Ct. Rec. 190 Ex. 1 at 5 & Ex. 2 at 5.)  Thus, Transportation's agreement to defend Bethlehem against Steveco's construction defect claims was made subject to a reservation of rights on the issue of whether the purported construction defects were covered by the Transportation Policies, i.e. caused by subcontractor work, rather than Bethlehem's own personal work.

In its Conflict of Law Motion, Bethlehem argues Washington and California law "significantly differ as to the duty of an insurer to provide a defense under a reservation of rights" and that the differences between the states' laws require a conflict of law analysis to determine which state's law governs the issue of whether Transportation fulfilled its obligations as an insurer when it defended Bethlehem subject to a reservation of rights in the Steveco action. (Ct. Rec. 56 at 6-7.)  In general, Bethlehem argues Washington and California law are in conflict because in Washington, an insurer is never required to appoint and pay for defense counsel independently selected by an insured when the insurer defends the insured subject to a reservation of rights; whereas, in California, an insured is entitled to the appointment of independently

///

///

ORDER ~ 41

selected counsel at the insurer's expense ("*Cumis* counsel") in "certain reservation of rights situations."[9] (Ct. Rec. 92 at 3-4.)

Transportation does not contest Bethlehem's claim that Washington and California law differ in some reservation of rights situations. (*See generally* Ct. Rec. 82 at 5-7.)  However, Transportation takes the position that no conflict of law analysis need be conducted on this issue here because Bethlehem was not entitled to the appointment of *Cumis* counsel even if California law were applied. *Id.* at 6-7.  Thus, as Transportation argues, because Transportation had no obligation to appoint *Cumis* counsel under either Washington or California law, no relevant actual conflict exists on this issue and the Court need not engage in a conflict of law analysis to determine which state's law controls this issue.

To determine whether a relevant actual conflict of law exists, the Court begins by addressing Transportation's claim that Bethlehem was not entitled to the appointment of *Cumis* counsel even if California were applied.

///

///

---

[9] In its opening memorandum, Bethlehem appears to assert a belief that under California law, *Cumis* counsel must be appointed in all reservation of rights scenarios. (Ct. Rec. 56 at 7.)  Bethlehem retreats from this position in its reply, when it argues *Cumis* counsel is only required in "certain" reservation of rights situations. (Ct. Rec. 92 at 4.)

ORDER ~ 42

### a. *Cumis* Counsel & Reservation of Rights Law

Under both Washington and California law, an insurer must "provide its insured with a defense to a third party's lawsuit when there exists a potential for liability under the policy." *Assurance Co. of Am. v. Haven*, 32 Cal. App. 4th 78, 83-84 (1995); *Tank v. State Farm Fire & Cas. Co.*, 105 Wash. 2d 381 (1986). "Under these circumstances, an insurer may provide a defense under a reservation of rights, agreeing to defend, but promising to indemnify only for conduct covered by the policy." *Haven*, 32 Cal. App. 4th at 84 (citing *San Diego Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 162 Cal. App. 3d 358, 364 (1984)); " *Tank*, 105 Wash. 2d at 387. In spite of this similarity, Washington and California law diverge with regard to how an insurer must carry out this duty to defend under a reservation of rights.

Under Washington law, when an insurer defends an insured subject to a reservation of rights, the insurer "must fulfill an enhanced obligation to its insured as part of its duty of good faith." *Tank*, 105 Wash. 2d at 387. A insurer's enhanced obligation is fulfilled by meeting the following standards:

> First, the company must thoroughly investigate the cause of the insured's accident and the nature and severity of the plaintiff's injuries. Second, it must retain competent defense counsel for the insured. Both retained defense counsel and the insurer must understand that only the insured is the client. Third, the company has the responsibility for fully informing the insured not only of the reservation-of-rights defense itself, but of *all* developments relevant to his policy coverage and the progress of his lawsuit. Information regarding progress of the lawsuit includes disclosure of all settlement offers made by the company. Finally, an insurance company must refrain from engaging in any action which would demonstrate a greater concern for the insurer's monetary interest than for the insured's financial risk.

ORDER ~ 43

1   *Id.* (emphasis in original).  In sum, although Washington law imposes

2   enhanced duties on an insurer choosing to defend an insured subject to

3   a reservation of rights, Washington does not require the insurer to pay

4   for counsel independently selected by the insured. *Johnson v. Cont'l Cas.*

5   *Co.*, 57 Wash. App. 359, 365 (1990).

6       However, under California law, if

7       the provisions of a policy of insurance impose a duty to defend
        upon an insurer and a conflict of interest arises which creates
8       a duty on the part of the insurer to provide independent
        counsel to the insured, the insurer shall provide independent
9       counsel [at the insurer's cost] . . . .

10  CAL. CIV. CODE § 2860(a); *see also Cumis Ins. Soc'y, Inc.*, 162 Cal. App.

11  3d at 376.  In spite of this general rule, "not every conflict of

12  interest triggers an obligation on the part of the insurer to provide the

13  insured with independent counsel at the insurer's cost." *James 3 Corp.*

14  *V. Truck Ins. Exch.*, 91 Cal. App. 4th 1093, 1101 (2001).  "For example,

15  the mere fact that the insurer disputes coverage does not entitle the

16  insured to *Cumis* counsel; nor does the fact the complaint seeks punitive

17  damages or damages in excess of policy limits." *Id.* (citing CAL. CIV. CODE

18  § 2860(b)).  "The insurer owes no duty to provide independent counsel in

19  these situations because the *Cumis* rule is not based on insurance law but

20  on the ethical duty of an attorney to avoid representing conflicting

21  interests." *Id.* (citing *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20

22  Cal. App. 4th , 1372, 1394 (1993).

23      Nonetheless, an "insurer's reservation of rights *may* create a

24  disqualifying conflict of interest requiring the insurer to pay the costs

25  of *Cumis* counsel to represent the underlying action." *Dynamic Concepts,*

26

ORDER ~ 44

*Inc. v. Truck Ins. Exch.*, 61 Cal. App. 4th 999, 1006 (1998) (emphasis added).  However,

> It depends upon the nature of the coverage issue, as it relates to the issues in the underlying case.  If the issue on which coverage turns is independent of the issues in the underlying case, *Cumis* counsel is not required.

*Blanchard v. State Farm Fire & Cas.*, 2 Cal. App. 4th 345, 350 (1991); CAL. CIV. CODE § 2860(b).

For this reason, under California law, when an insurer elects to defend an insured subject to a reservation of rights, a conflict of interest requiring the appointment of *Cumis* counsel "does not arise unless the outcome of the coverage issue can be controlled by counsel first retained by the insurer for the defense of the underlying claim." *Id.* (citing CAL. CIV. CODE § 2860(b) ("[W]hen an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim . . . .").  If this type of conflict of interest does arise, the insurer may be required to pay for *Cumis* counsel. *Id.* § 2860(b) & ©).

Thus, as the parties agree, because California law requires the appointment of *Cumis* counsel in *certain* reservation of rights situations, an actual conflict of law exists between Washington law, which never requires the insurer to retain counsel independently selected by the insured.  Therefore, if Bethlehem was entitled to *Cumis* counsel under California law, as Bethlehem asserts, the Court must engage in a conflict of law analysis on this issue.  However, if California law did not require the appointment of *Cumis* counsel, the Court need not engage in a conflict of law analysis and Washington law, as the forum state's law, would govern this issue.  Accordingly, the Court must determine whether

ORDER ~ 45

Transportation's decision to defend Bethlehem subject to a reservation of rights on Steveco's construction defects claim required the appointment of *Cumis* counsel under California law.[10]

### b. Analysis

In the underlying suit, Steveco sued Bethlehem for breach of contract and negligence. (Ct. Rec. 174 Ex. 10.) Steveco alleged Bethlehem was liable for misconduct that resulted, in part, in the construction of a defective cold storage facility.[11] *Id.* Steveco claimed its construction defect damages were the result of Bethlehem's direct actions and/or actions take by Bethlehem's subcontractor. *Id.* More specifically, Mr. Addleman, Bethlehem's president, claims Steveco alleged Bethlehem was directly liable for failing to

> apply proper means and methods (failing to grout pick eye pockets at the tops of the beams, failing to properly seal the beam end plates, and failing to properly coordinate the work self-performed by the owner and the work of its multiple prime contractors). . . .

---

[10] "In the absence of dispute over some underlying fact, the existence of a conflict [that would require the appointment of *Cumis* counsel] is a question of law for the trial judge to decide, not a jury question." *Blanchard*, 2 Cal. App. 4th at 350. Therefore, because there is no factual dispute concerning appointment of *Cumis* counsel, the Court appropriately addresses the merits of this issue as a question of law.

[11] For the most part, Steveco's construction defect complaints focused on the spalling concrete beams used to support the cold storage facilities' cooling system. (*See generally* Ct. Rec. 174 Ex. 10.)

ORDER ~ 46

(Ct. Rec. 92-3 ¶ 5.)    Mr. Addleman also explains that Steveco was alleging Bethlehem was vicariously liable because (1) "Bethlehem's painting subcontractor selected the wrong coating, failed to get complete coverage of the coating he applied, used the wrong technique to apply the coating (failing to backroll after spraying), and applied the wrong mil thickness of the coating" and (2) Bethlehem's engineer subcontractor failed "to inquire about the environment where the beams were to be installed (subject to freezing conditions and exposure to caustic salts contained in the defrost water), and his failure to account for sulfur dioxide corrosion of the beam end plates." *Id.*

As explained above, the construction defects complained of by Steveco were excluded from coverage under the Transportation Policies if they were caused by or the result of Bethlehem's "work." (See Ct. Rec. 190 Ex. 1 at 4 & Ex. 2 at 4.)    However, if the construction defects were caused by or the result of worked performed on behalf of Bethlehem by subcontractors, the damages were covered by the Transportation Policies. *Id.*    For this reason, unless and until it was proved that neither Bethlehem nor its subcontractors caused the construction defects, Bethlehem's and Transportation's interests with regard to what caused the construction defects were divergent.

As previously detailed, the appointment of *Cumis* counsel may be required "when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim . . . ." CAL. CIV. CODE § 2860(b).    The determination of whether the appointment of *Cumis* counsel under § 2860(a) is required in reservation of right scenarios

"depends upon the nature of the coverage issue, as it relates to the issues in the underlying case." *Blanchard*, 2 Cal. App. 4th at 350. "If the issue on which coverage turns is independent of the issues in the underlying case, *Cumis* counsel is not required." *Id.*

Here, Bethlehem argues Transportation's decision to defend Bethlehem in the Steveco action subject to a reservation of rights created a conflict of interest requiring the appointment of *Cumis* counsel under § 2860(a) because Mr. Crowley, the attorney retained by Transportation, was placed in a position to address (or not address) the various causes for the construction defects claimed by Steveco and "thereby affect the existence of coverage." (Ct. Rec. 92 at 7.) In support of its claim that the reservation of rights created a § 2860(a) conflict, Bethlehem explains:

> The problem each of these conflicting coverage issues presents is that the attorney hired by Transportation is conflicted; should he emphasize, or deemphasize, one or more of the factors that can trigger (or destroy) the insurer's indemnification duty? For example, does he rebut, and perhaps even try to dismiss on a pretrial motion, claims based upon the painting subcontractor's defective coating, and upon the engineering subcontractor's failure to employ proper means and methods? Does he spend proportionately less time attacking the claims regarding Bethlehem's efforts on the pick points? If so, he enhances the insurer's effort to avoid liability for indemnification.

*Id.* In sum, Bethlehem argues "Transportation's interests [were] adverse to those of Bethlehem" and that "the counsel Transportation hired for Bethlehem could control the outcome of [the] coverage issues by choices regarding how to prepare and try the [Steveco] case." *Id.* at 8.

In response, Transportation asserts that

> [n]either the law nor Steveco cared whether problems with the beams were caused by [Bethlehem] of by [Bethlehem's] subcontractor. Steveco did not assert alternate causes of

> action such that the defense strategy could realistically
> affect the outcome of the coverage dispute (compare negligence
> and battery injury lawsuit). If the beams were bad, then
> [Bethlehem] arguably breached its contract, whether the fault
> was a subcontractor's or not.

(Ct. Rec. 485 at 3.) Transportation then dismisses as "theoretical and unrealistic" Bethlehem's fear that counsel retained by Transportation might have

> inject[ed] extrinsic coverage issues into the lawsuit by filing
> very specific dispositive motion on factual theories within the
> subcontractor exception as a means of establishing that any
> judgment was not based on covered facts, and neglect to defend,
> or provide only a token defense, on excluded factual theories.

*Id.*

In support of its position that *Cumis* counsel was not required under California law, Transportation likens Bethlehem's circumstances to those found in *Blanchard*, where the California Court of Appeals determined the insured/plaintiff was not entitled to *Cumis* counsel. *See* 2 Cal. App. 4th at 350. Because *Blanchard* is easily distinguished from this case, it does not control the issues faced here and Transportation's reliance on the case is misplaced.

In *Blanchard*, the insured/plaintiff, which was a general contractor like Bethlehem, had been sued by a homeowners association for property damage caused by various construction defects. *Id.* at 347. The insured/plaintiff tendered the homeowners association's claims to its insurer for defense. *Id.* The insurer offered to defend the insured/plaintiff, but subject to a reservation of rights on the issue of whether certain damages were covered by the insurance policy, which excluded from coverage the insured/plaintiff's workmanship, i.e. damage to property built and/or repaired by the insured/plaintiff, but covered

damage to property not built and/or repaired by the insured/plaintiff. *Id.* at 348. Neither the insured/plaintiff nor the insurer disputed what damages were covered by the insurance policy. *Id.* Nevertheless, the insured/plaintiff took the position, which was rejected by the insurer, that the insurer's reservation of rights as to the extent of damages created a conflict of interest requiring the appointment of *Cumis* counsel. *Id.* at 349.

The California Court of Appeals ultimately sided with the insurer and held that no "conflict of interest of the type requiring appointment of independent counsel" existed between the insured/plaintiff and its insurer. *Id.* The court based its opinion on the conclusion that the attorneys appointed by the insurer "had no incentive to attach liability" to the insured/plaintiff and that it was to both parties' advantage to minimize the underlying liability because the insurer had already recognized its liability for a portion of the damages. *Id.* at 350. In addition, the court in *Blanchard* also emphasized the fact that the insured/plaintiff "produced no evidence to show in what specific way the defense attorney could have controlled the outcome of the damage issue to [the insured/plaintiff's] detriment, or had incentive to do so." *Id.* For this reason, the court described the insured/plaintiff's purported conflict of interest as one that was merely "an unspecified *possibility*". *Id.* (emphasis in original).

The circumstances faced by the insured/plaintiff in *Blanchard* are materially different than the circumstances faced by Bethlehem in the Steveco case. In *Blanchard*, unlike this case, the coverage issue was limited to a determination of how much of the property damage the insurer

ORDER ~ 50

must cover, as opposed to a determination of whether coverage existed at all. *Id.* Thus, counsel retained by the insurer in *Blanchard* to defend the insured/plaintiff was not placed in a position where the decisions made during the homeowners association action could ultimately affect coverage issues - the damaged property was either built and/or repaired by the insured/plaintiff and excluded from coverage *or* not built and/or repaired by the insured/plaintiff and covered by the insurance policy. *Id.* This is distinguishable from circumstances found in the Steveco action because Mr. Crowley was placed in a position where he would have to defeat Steveco's claims that the construction defects were (1) caused by subcontractors, which ran counter to Bethlehem's coverage interests, and (2) caused by Bethlehem, which ran counter to Transportation's coverage interests.

The Court believes better guidance on the issues faced here is gleaned from the paradigm-shifting case of *San Diego Navy Federal Credit Union v. Cumis Insurance Society, Inc.*, 162 Cal. App. 3d 358 (1984). The *Cumis Insurance Society* opinion, which was ultimately codified in § 2860, detailed when *Cumis* counsel must be appointed. *Id.* It focused on the dual ethical duties owed by counsel retained by an insurer to represent an insured in a third-party suit. *Id.* The court in *Cumis Insurance Society* concluded that the dual ethical duties required the appointment of independent counsel selected by the insured when, due to the nature of the underlying dispute, findings adverse to the insured would have benefitted the insurer's coverage interests. *Id.*

*///*

*///*

ORDER ~ 51

In drawing its ultimate conclusion, the court in *Cumis Insurance Society* explained

> [d]ual representation by counsel is beneficial since the shared goal of minimizing or eliminating liability to a third party is the same. A different situation is presented, however, when some or all of the allegations in the complaint do not fall within the scope of coverage under the policy. In such a case, the standard practice of an insurer is to defend under a reservation of rights where the insurer promises to defend but states it may not indemnify the insured if liability is found. In this situation, there may be little commonality of interest. *Opposing poles of interest are represented on the one hand in the insurer's desire to establish in the third party suit the insured's "liability rested on intentional conduct", and thus no coverage under the policy, and on the other hand in the insured's desire to "obtain a ruling . . . such liability emanated from the nonintentional conduct within his insurance coverage.*

*Id.* at 364 (emphasis added). Thus, "[a]lthough issues of coverage under the policy are not actually litigated in the third party suit, this does not detract from the force of these opposing interests as they operate on the attorney selected by the insurer, who has a dual agency status." *Id.* at 364-65.

As was the case in the third-party suit underlying *Cumis Insurance Society*, where the insurer-selected attorney was faced with the competing interests of attaching liability to (1) the insured's intentional conduct, which would have benefitted the insurer in the subsequent coverage determination, and (2) the insured's nonintentional conduct, which would have benefitted the insured in the subsequent coverage determination, Mr. Crowley, Bethlehem's Transportation-appointed attorney, was faced with similar competing interests. On one hand, Mr. Crowley was motivated to attach liability for the construction defects to Bethlehem's personal conduct, which would have benefitted Transportation's coverage interests and disadvantaged Bethlehem.

ORDER ~ 52

Meanwhile, on the other hand, Mr. Crowley was motivated to attach liability for the construction defects to Bethlehem's subcontractor's conduct, which would have benefitted Bethlehem's coverage interests and disadvantaged Transportation.

Although Transportation is correct in noting that neither Steveco nor the law cared whether the purported construction defects were caused by Bethlehem or its subcontractors, this fact does nothing to eliminate the above-described conflict or the force the competing interests had on Mr. Crowley as a dual agent of Bethlehem and Transportation. Mr. Crowley owed fiduciary duties to both Bethlehem and Transportation. *Gafcon, Inc. v. Ponsor & Associates*, 98 Cal. App. 4th 1388, 1406 (2002). These fiduciary duties were compromised by Bethlehem and Transportation's diverging interest in the Steveco action, i.e. Mr. Crowley could not take steps to prove Bethlehem's subcontractors did not cause the construction defects without jeopardizing Bethlehem's coverage interests and vice versa with regard to Transportation's coverage interests and proving Bethlehem's conduct did not cause the construction defects. Accordingly, Mr. Crowley's common representation of Bethlehem and Transportation, which rendered his representation of each party less effective, gave rise to a conflict of interest. *Golden Eagle Ins. Co.*, 20 Cal. App. 4th at 1396 ("[A]n attorney representing the interests of the insurer and the insured is subject to the rule a '[c]onflict of interest between jointly represented clients occurs whenever their common lawyer's representation of the one is rendered less effective by reason of his representation of the other.'"). Because Mr. Crowley's common representation was

ORDER ~ 53

1  conflicted, if California law applied, Bethlehem was entitled to the
2  appointment of *Cumis* counsel. *See* CAL. CIV. CODE § 2860(a).

3      As was the case in *Cumis Insurance Society*, it does not matter that
4  Mr. Crowley could have pursued a defense of total nonliability on behalf
5  of both Bethlehem and Transportation, which would have been in the
6  parties' common interest. Mr. Crowley still would have had to make
7  certain decisions during discovery and trial that may have had adverse
8  effects on either Bethlehem or Transportation. *Cumis Ins. Soc'y*, 162 Cal.
9  App. 3d at 365. For example, Mr. Crowley would have had to seek or
10 oppose special verdicts, the answers to which would have either
11 benefitted Bethlehem and harmed Transportation or benefitted
12 Transportation and harmed Bethlehem in their respective coverage
13 positions. *Id.* As the court in *Cumis Insurance Society* recognized, these
14 types of "decisions are numerous and varied" and "[e]ach time one of them
15 must be made, the lawyer is placed in the dilemma of helping one of his
16 clients concerning insurance coverage and harming the other." *Id.*
17 Similarly, the "potential problems may develop during pretrial discovery
18 which must go beyond simple preparation for a favorable verdict to
19 develop alternate strategies minimizing exposure." *Id.* at 366. Mr.
20 Crowley, as the insurer-retained counsel in *Cumis Insurance Society*,

21      was bound to investigate all conceivable bases on which
        liability might attach. These investigations and client
22      communications may provide information relating directly to the
        coverage issue. Furthermore, counsel may form an opinion about
23      the insured['s] credibility. As between counsel's two clients,
        there is no confidentiality regarding communications intended
24      to promote common goals. But confidentiality is essential
        where communication can affect coverage. Thus, the lawyer is
25      forced to walk an ethical tightrope, and not communicate
        relevant information which is beneficial to one or the other
26      of his clients.

ORDER ~ 54

1  *Id.*

2      For the above stated reasons, the Court finds the conflicts of
3  interest asserted by Bethlehem were actual, significant, and
4  demonstrative of Mr. Crowley's ability to control the outcome of coverage
5  issues. Accordingly, under California law, the Court concludes Bethlehem
6  was entitled to the appointment of *Cumis* counsel in the under lying
7  Steveco action. *See* CAL. CIV. CODE § 2860(a)-(c). Because Bethlehem was
8  not entitled to the appointment of *Cumis* counsel under Washington law,
9  an actual conflict exists on this issue and a conflict of law analysis
10 must be conducted to determine whether Washington or California law
11 governs this issue. *Burnside v. Simpson Paper Co.*, 123 Wash. 2d 93, 100-
12 01 (1994).

13              **c. Conflict of Law Analysis**

14      In determining whether Washington or California law governs
15 Bethlehem's entitlement to *Cumis* counsel, the Court must engage in the
16 two-step conflict of law analysis set forth above with regard to
17 prejudgment interest issue. *See N. Ins. Co. of N.Y. v. Allied Mut. Ins.
18 Co.*, 955 F.2d 1353, 1359 (1992). Under this two-step analysis, the Court
19 must first evaluate the nature of contacts the parties and contract have
20 with the conflicting jurisdictions. *Barr v. Interbay Citizens Bank of
21 Tampa*, 96 Wash. 2d 692, 697 (1981); *see generally* RESTATEMENT (SECOND) OF
22 CONFLICT OF LAWS § 188.

23      Next, the Court must "consider the competing policies and interests
24 of the two states with respect to application of their laws" by
25 addressing the competing policies and interests of the conflicting states
26 in light of the contacts addressed in the first step. *Spider Staging Co.*,

87 Wash. 2d at 581; *Dairyland Ins. Co.*, 41 Wash. App. at 31 (citing *Potlatch No. 1 Fed. Credit Union*, 76 Wash. 2d at 810-11; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2)). Following this second step, based on its consideration of the step one contacts and the states' relative interests in having their law applied, the Court must determine which state has the most significant relationship to the *Cumis* counsel issue and apply that state's law.

### i. Step One: Consideration of Contacts

Washington's contacts with the parties in this action and the insurance contracts in questions include: (1) the insurance policies were entered into in Washington through Mr. Zimmerman, a Washington insurance broker; (2) the policies covered projects Bethlehem was associated with in Washington; and (3) Bethlehem is incorporated and maintains its principal place of business in Washington. California's contacts include: (1) in addition to Washington projects, the insurance policies covered the work being performed at the Lucich Farms work site in California; (2) Bethlehem maintains an office in California; (3) the underlying Steveco action occurred in California; and (4) Mr. Crowley, the defense attorney appointed by Transportation to defend Bethlehem, was a California attorney. In addition, the Court notes that neither Defendant was incorporated in or maintained its principal place of business in California.

### ii. Step Two: Competing Interests & Policies

Polices requiring the appointment of *Cumis* counsel under California law and the enhanced duties imposed on insurers in reservation of rights scenarios under Washington law are intended to protect California and

ORDER ~ 56

Washington insureds when conflicts of interest arise between them and their insurers. *See generally Tank v. State Farm Fire & Cas. Co.*, 105 Wash. 2d 381 (1986); *Cumis Ins. Soc'y,* 162 Cal. App. 3d at 358.  For this reason, both states are interested in seeing the respective protections outlined in § 2860 and *Tank* implemented when conflicts of interest arise between their insureds and insurers in reservations of rights situations. *Id.*  Thus, Washington and California have the same interest in protecting insureds and the only material difference between the states is the degree of protection each state believes their insureds should be afforded.  California requires the appointment of *Cumis* counsel in certain situations, an additional protection for insureds that Washington does not.

### iii. Most Significant Relationship Analysis

After considering the parties' and the insurance contract's contacts with Washington and California and the states' respective interests in having their law applied to the *Cumis* counsel issue raised in this section, the Court finds California has the most significant relationship to the issue.  Accordingly, California law governs the issue of whether Bethlehem was entitled to an appointment of *Cumis* counsel in the underlying Steveco action.

Although Bethlehem is not incorporated in California, it does maintain an office in California and was engaged in business there.  Thus, the Court believes California had an interest in providing the protections outlined in § 2860 to Bethlehem.  Because these protections were greater than those provided for under *Tank*, Bethlehem is a Washington corporation, and Transportation is not a Washington

ORDER ~ 57

1  corporation, Washington has no interest in seeing the enhanced

2  requirements outlined in *Tank* prevail over the heightened protections

3  provided to insureds under California law.

4      Finally, the Court does not believe the Ninth Circuit's opinion in

5  *Northern Insurance Company*, as Transportation suggests, mandates a

6  conclusion that Washington law controls in this instance.    To the

7  contrary, the *Northern Insurance Company* opinion, if anything, supports

8  the Court's conclusion that Washington has no interest in having its more

9  lenient standards applied. *See* 955 F.2d at 1358-60.

10     **2. Bethlehem's Grape Claim**

11     Because the Court has determined Bethlehem was entitled to the

12 appointment to *Cumis* counsel by Transportation based on the conflict of

13 interest arising from Transportation's reservation of rights on Steveco's

14 construction defect claims, the Court need not address whether *Cumis*

15 counsel was required based on Bethlehem's claim that Steveco

16 independently blamed Transportation for the grape loss.    Nevertheless,

17 the Court concludes *Cumis* counsel was not required based on this

18 circumstance.  This is because Bethlehem's and Transportation's interests

19 were aligned on this issue.  Transportation had no interest in attaching

20 liability to Bethlehem on this issue because if Bethlehem were found

21 liable for the grape loss, those damages would have been covered by the

22 Transportation Policies. (*See* Ct. Rec. 190 Ex. 1 & 2.)    Thus,

23 Transportation, wanted the same thing as Bethlehem - a finding that the

24 grape loss was not caused by Bethlehem.   Therefore, no conflict of

25 interest was created by this circumstance and *Cumis* counsel was not

26 required by § 2860.

**C. Punitive Damages**

Bethlehem also asks the Court to declare California law governs the issue of whether punitive damages may be recovered in this case. Transportation and St. Paul oppose Bethlehem on this issue, arguing Washington law controls this issue and for that reason, punitive damages are not available.

**A. Actual Conflict Analysis**

Washington law does not permit the award of punitive damages unless expressly authorized by statute. *Barr*, 96 Wash. 2d at 699 ("Since 1891, in an unbroken line of cases, it has been the law of this state that punitive damages are not allowed unless expressly authorized by the legislature."). Because the Washington Legislature has not enacted a statute permitting the award of punitive damages in breach of contract and/or bad faith cases, Bethlehem may not recover punitive damages from Defendants if Washington law is applied with regard to this issue.

However, in contrast, under California law, Bethlehem may pursue punitive damages against Defendants should Defendants be found to have acted in bad faith. *See* Cal. Civ. Code § 3294(a); *PPG Indus., Inc. v. Transaction Ins. Co.,* 84 Cal. Rptr. 2d 455, 461 (1999) (Punitive damages may be recovered from an insurance company "if in addition to proving a breach of the implied covenant of good faith and fair dealing proximately causing actual damages, the insured proves by clear and convincing evidence that the insurance company itself engaged in conduct that is oppressive, fraudulent, or malicious."). Because the result could be different under the two states' laws on this issue, an actual conflict

exists and a conflict of law analysis must be undertaken to determine which state's law governs Bethlehem's right to seek punitive damages.

### B. Conflict of Law Analysis

As is the case with issues arising in contract, Washington courts also utilize the most significant relationship rule to determine which state's law is to be applied when actual conflicts relate to tort issues. *Barr*, 96 Wash. 2d at 697. When applied in the tort context, the most significant relationship rule involves a two-step analysis nearly identical to the approach described above with regard to the prejudgment interest and *Cumis* counsel issues. *See Southwell v. Widing Transp.*, Inc., 101 Wash. 2d 200, 204 (1984).

"The first step involves an evaluation of the contacts with each interested jurisdiction." *Id.* The contacts to be considered under the first step include:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

*Barr*, 96 Wash. 2d at 697-98 (quoting RESTATEMENT (SECOND) OF CONFLICTS § 145(2)). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Southwell*, 101 Wash. 2d at 204. Furthermore, as is the case with contract-based conflicts, the "approach is not merely to count contacts, but rather to consider which contacts are most significant and to determine where these contacts are found." *Id.* (citing *Spider Staging, Inc.*, 87 Wash. 2d at 581).

The contacts addressed in the first step are then used in the second step to evaluate the "interests and public policies of potentially

ORDER ~ 60

concerned jurisdictions.  The extent of the interest of each potentially interested state should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and the particular issue involved." *Id.*  Following this second step, based on its consideration and analysis of the above-described contacts and the states' relative interests, a court must determine which state has the most significant relationship to the issue in question and apply that state's law to the issue.

In this instance, due to the tort-nature of the issue, the Court applies the two-step most significant relationship test described above to determine which state's law, Washington or California, controls the recoverability of punitive damages in this action.

### 1. Step One: Consideration of Contacts

The following Washington contacts, some of which were recited above, are evident from materials submitted by the parties and relevant to the Court's punitive damages conflict of law analysis: (1) Bethlehem is incorporated and maintains its principal place of business in Washington; (2) Transportation and St. Paul both conduct business in Washington by selling insurance through agents; (3) Bethlehem's alleged bad faith damages are all monetary in nature and were presumably suffered in Washington due to the fact Bethlehem is incorporated and has its principal place of business in Washington; and (4) Bethlehem's respective relationships with Transportation and St. Paul appear to have originated and been centered in Washington based on the fact Bethlehem purchased the Transportation and St. Paul policies through Mr. Zimmerman, an insurance agent of working for an insurance company located in Washington.

ORDER ~ 61

The following California contacts are also relevant to the Court's punitive damages conflict of law analysis: (1) Bethlehem conducts business in California; (2) the Transportation and St. Paul policies covered Bethlehem's construction projects in California; and (3) the conduct alleged by Bethlehem to have constituted bad faith under the insurance polices occurred in California, e.g. Transportation's decision to not hire *Cumis* counsel and St. Paul's decision to not provide Bethlehem with a defense in the Steveco action.   In addition, the Court notes that neither Transportation nor St. Paul are incorporated or maintain their principal places of business in Washington or California.

## 2. Step Two: Competing Interests & Policies

Washington has a long judicial history of refuting punitive damages. *See Spokane Truck & Dray Co. v. Hoefer*, 2 Wash. 45 (1891); *Barr*, 96 Wash. 2d at 699.   In *Spokane Truck & Dray Co.*, 2 Wash. 45 (1892), the oldest Washington case addressing the issue of punitive damages located by this Court, the Washington Supreme Court rejected the doctrine of punitive damages.   This rejection was primarily based on the court's objection to adding the criminal element of punishment into the civil system. *Id.* at 51-52.   In addition, the court disapproved of the windfalls plaintiffs reap in instances where punitive damages are awarded. *Id.*   In general, the Court in *Spokane Truck & Dray Co.* believed civil actions should be geared towards compensating victims for their injuries and punitive damages did not further this goal. *Id.*

In contrast, the California legislature and judiciary have embraced the concept of punitive damages and recognized their public purpose. *Ferguson v. Lieff, Cabraser, Heimann & Bernstein*, 30 Cal. 4th 1037, 1046

1  (2003).  In California, punitive damages are viewed as an effective means

2  for punishing tortfeasors whose conduct is intentional or malicious and

3  deterring them and others from engaging in similar future conduct. *Id.*

4  ### 3. Most Significant Relationship Analysis

5       Based on the parties' relative contacts with Washington and

6  California, and the states' interests in having their law applied, the

7  Court finds California has the most significant relationship to issue of

8  whether punitive damages may be awarded.  For this reason, the Court

9  concludes California law controls this issue.

10      In *Barr*, the Washington Supreme Court addressed the issue of whether

11  Florida's punitive damages laws govern a tort action brought in

12  Washington. 96 Wash. 2d 692.  Although the court in *Barr* ultimately held

13  Washington law controlled the issue, the Court stressed the importance

14  of where the tortious conduct occurred. *Id.* at 699-700.  Here, the

15  alleged tortious conduct, i.e. bad faith, occurred in California, where

16  Bethlehem was defending the Steveco action and Defendants are alleged to

17  have acted in bad faith by violated certain defense obligations Bethlehem

18  claims it was owed under the Transportation and St. Paul Policies.  For

19  this reason, under *Barr* and the Restatement (Second) of Conflicts of Laws

20  § 145, Comment C, the Court finds concurs with Bethlehem's claim that

21  California law governs punitive damages issues.

22      In addition and as part of this ruling, the Court concludes that

23  California's interest in having its punitive damages laws applied

24  outweighs Washington's policy concerns for not imposing punitive damages.

25  This conclusion is based on California's strong interest in policing

26  insurers that provide insurance to individuals and entities operating in

California by ensuring the insurers are punished and thereby deterred from intentionally and maliciously acting in bad faith when offering services in California. Washington's connection to the alleged bad faith is minimal in that neither of the insurers are incorporated in Washington and the conduct giving rise to the tort did not occur here. Thus, any interest Washington may have in keeping punishment out of the civil system or protecting Washington business is non-existent. Accordingly, because California law has the most significant relationship to the punitive damage issues arising in this case, California law governs these issues.

## IV. Conclusion

For the above-stated reasons, the Court finds California law governs the (1) prejudgment interest on unliquidated contract-based damages, (2) appointment of *Cumis* counsel, and (3) punitive damage issues arising in this case. In addition, the Court finds Bethlehem was entitled to the appointment of *Cumis* counsel by Transportation in the underlying Steveco action. Finally, the Court finds Bethlehem is not entitled to prejudgment interest on unliquidated damages or attorneys' fees arising from Bethlehem's bad faith claims.

Accordingly, **IT IS HEREBY ORDERED:**

1. Transportation's Prejudgment Interest Motion **(Ct. Rec. 45)** is **GRANTED IN PART** (prejudgment interest is not recoverable on unliquidated damages or attorneys' fees caused by bad faith) and **DENIED IN PART** (prejudgment interest is recoverable on unliquidated contract-based damages).

2.  Bethlehem's Conflict of Law Motion **(Ct. Rec. 55)** is **GRANTED IN PART** (California law governs issues regarding (1) the recoverability of prejudgment interest on unliquidated contract-based damages, (2) Bethlehem's entitlement to the appointment of *Cumis* counsel by Transportation, and (3) the recoverability of punitive damages) and **DENIED IN PART** (Washington law governs issues regarding the recoverability of prejudgment interest on unliquidated damages and attorneys' fees caused by bad faith).

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this ___27th___ day of September 2006.


_____S/ Edward F. Shea_____

EDWARD F. SHEA
United States District Judge

Q:\Civil\2003\0324.MSJ.conflict.of.law-2.wpd

ORDER ~ 65