UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BETHLEHEM CONSTRUCTION, INC., Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>TRANSPORTATION INSURANCE COMPANY, a foreign corporation; and ST. PAUL REINSURANCE COMPANY, LIMITED, a foreign corporation,<br><br>Defendants. | NO. CV-03-0324-EFS<br><br>**ORDER GRANTING ST. PAUL'S BREACH OF CONTRACT MOTION AND GRANTING IN PART AND DENYING AS MOOT IN PART ST. PAUL'S BAD FAITH MOTION AND DENYING AS MOOT ST. PAUL'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING RESCISSION OF 2001 CGL GAP POLICY** |

On June 2, 2005, the Court conducted an in-person hearing in the above-captioned case. Appearing at the hearing were Joel McCormick and John Herrig on behalf of Plaintiff Bethlehem Construction, Inc. ("Bethlehem"), David Schoeggl and Kasey Huebner on behalf of St. Paul Reinsurance Company Ltd. ("St. Paul"), and Joseph Hampton on behalf of Transportation Insurance Company ("Transportation"). During the June 2, 2005, hearing, the Court heard oral argument on St. Paul's Motion for Summary Judgment Re: Breach of Contract ("Breach of Contract Motion") (Ct. Rec. 191) and St. Paul's Motion for Summary Judgment Re: Bad Faith ("Bad Faith Motion") (Ct. Rec. 192). After reviewing the submitted materials and hearing oral argument, the Court is fully informed and

ORDER ~ 1

hereby grants St. Paul's Breach of Contract Motion and grants in part and denies as moot in part St. Paul's Bad Faith Motion.

### I. Background[1]

**A. The Underlying Insurance Policies**

In 1999 and 2000, Eric Zimmerman, an insurance agent with Bratrud Middleton Insurance Company in Tacoma, Washington sold Bethlehem insurance policies underwritten by Transportation and St. Paul that covered risks associated with construction projects Bethlehem was involved with. *Id.* ¶ 6-7.

**1. Transportation Policy**

Under the "Coverage A Bodily Injury and Property Damage Liability Sections" of Transportation Commercial General Liability Insurance Policy Nos. C1082227545 ("Transportation Policies"),[2] Transportation and Bethlehem agreed Transportation would "pay those sums that [Bethlehem] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which [the Transportation Policies applied]." (Ct. Rec. 190 Exs. 1 at 2 & 2 at 2.)  In addition, the parties agreed Transportation had "the right and duty to defend the insured against any 'suit' seeking those damages." *Id.*

One Transportation policy covered applicable "property damage" caused by occurrences taking place in the United States during the policy

---

[1]  In ruling on a motion for summary judgment, the Court considers the facts and all reasonable inferences therefrom as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1972) (*per curiam*).  The following factual recitation was created with this standard in mind.

[2]  Aside from the policy periods, the terms and conditions set forth in the two Transportation Policies appear to be identical.

ORDER ~ 2

period of December 31, 1999, to December 31, 2000, *id.* Ex. 1 at 2 & 10, and the other Transportation policy covered applicable "property damage" caused by occurrences taking place in the United States during the policy period of December 31, 2000, to December 31, 2001, *id.* Ex. 2 at 2 & 10. The Transportation Policies define "property damage" as follows:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*Id.* Ex. 1 at 13 & Ex. 2 at 13.

The following exclusion was included in the Exclusion Sections of the Transportation Policies:

> This insurance does not apply to:

> l. Damage to Your Work

>> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operation hazard".

>> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

*Id.* Ex. 1 at 5 & Ex. 2 at 5. "Your work" was defined in the policies as follows:

> a. Work or operations performed by you or on your behalf; and

> b. Materials, parts or equipment furnished in connection with such work or operations.

*Id.* Ex. 1 at 13 & Ex. 2 at 13.

///

///

ORDER ~ 3

**2. St. Paul Policy**

Under the "Property Damage Liability Coverage Section" of St. Paul CGL Gap Insurance Policy No. USG10135 ("St. Paul Policy"), St. Paul and Bethlehem agreed St. Paul would pay those damages Bethlehem became legally obligated to pay as a result of "property damage" to Bethlehem's "work," unless the damaged work or the work out of which the damage [arose] was performed on [Bethlehem's] behalf by a subcontractor." (Ct. Rec. 252 Exs. A at 4.)

In addition, the parties agreed St. Paul had

> the right and duty to defend [Bethlehem] against any "suit" seeking damages because of "property damage" to which [the St. Paul Policy] applies if the insured is not entitled to a defense or indemnification of defense costs under any other policy or policies of insurance. If [Bethlehem] is entitled to such a defense or indemnification of defense costs under any other policy or policies of insurance, [St. Paul] will have the right but not the duty to defend [Bethlehem] against any "suit" seeking damages because of "property damage" to which [the St. Paul Policy] applies. However, [St. Paul] will have no duty to defend [Bethlehem] against any "suit" seeking damages for "property damages" to which [the St. Paul Policy] does not apply.

*Id.* The St. Paul Policy covered applicable "property damage" caused by occurrences taking place in the United States during the policy period of February 16, 2000, to February 16, 2001, *Id.* Ex. A at 1. The terms "property damage" and "work" have the same meaning as they do in the Transportation policies. See *Id.* Ex. A at 15 & 16.

Finally, the St. Paul Policy also states:

> [St. Paul] will have no duty under this policy to defend [Bethlehem] against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, [St. Paul] will undertake to do so, but [St. Paul] will be entitled to the insured's rights against all those other insurers.

ORDER ~ 4

*Id.* Ex. A at 11.   In the St. Paul Policy, "'[s]uit' means a civil proceeding in which damages because of 'property damage' to which [the St. Paul Policy] applies are alleged." *Id.* Ex. A at 16.

**B. The Underlying Construction Project & Insurance Claims**

In early 2000, Bethlehem and California Controlled Atmosphere ("CalCA") entered into separate construction contracts with Steveco to jointly design and build a cold storage facility in Bakersfield, California ("storage facility"). (Ct. Rec. 174 Ex. 18 at 1.)  The storage facility was to be used by Lucich Farms Cold Storage, LLC ("Lucich Farms") for the storage of table grapes. *Id.*  Bethlehem was to design and construct the storage facilities buildings, while CalCA was to design and construct the storage facility's refrigeration system. *Id.*  Engel & Company was hired by Bethlehem as a subcontractor to perform certain structural engineering duties Bethlehem was ultimately responsible for under Bethlehem's contract with Steveco. *Id.*  The storage facility was constructed in two phases ("Phase I and Phase II"). *Id.*  Phase I commenced in early 2000 and ended on August 22, 2000, when the portion of the storage facility constructed during Phase I was opened for operation. *Id.*  Phase II was completed in the fall of 2001. *Id.* at 2.

**1. Damaged Grapes**

On July 23, 2001, during Phase II of the project, a layer of white powder was discovered on 23,362 boxes of grapes being stored in a pre-cooling room constructed during Phase I. (Ct. Rec. 174 Ex. 1 at 1.) Prior to the discovery of the powder, the grapes had a wholesale market value of $350,337.00. *Id. Ex. 1 at 2.*  The powder had a "paint-like feel and appearance, and since Bethlehem's painters had been present and

working at the site for several days, grape shipments were halted and Bethlehem was contacted." *Id. Ex. 1 at 1.*

On August 23, 2001, thirty days after the mysterious white powder was discovered on the grapes, Associated Laboratories, a laboratory retained by Transportation to determine the source of the white powder, issued a report stating the grapes "were found to be fit for human consumption if properly and completely rinsed." *Id.* Ex. 1 at 2. However, by that time, the grapes had aged considerably, and their condition was too poor for normal sale and only $15,700.00 was received through a salvage sale. *Id.* The final grape-related loss totaled $334,637.00.

**2. Construction Defects**

In a letter dated October 5, 2001, Steveco provided Bethlehem with formal notice of certain Phase I construction defects Steveco become aware of with the storage facility and requested their repair. *Id.* Ex. 1 at 3-4. These defects included:

> (a) the concrete support beams for the refrigeration unit that have corrosion problems; (b) rusting black iron supports of the sprinkler system; (c) painting of rooms 3, 4, 7, 8 and the precooler; and (d) caulking of bunkers, specifically for leaks from room 5 to 7, and various leaks and open areas in the precooler.

*Id.*

Later on October 5, 2001, at Bethlehem's request, structural engineer and concrete consultant Robert E. Tobin inspected the concrete beams complained of by Steveco and prepared a report of his findings and recommendations. (Ct. Rec. 197-4 at 8-15.) In his report, Mr. Tobin described the damaged concrete beams as follows:

> The separate cooling systems consist of a network of horizontal aluminum refrigeration coils located near the roof. These coils in turn are supported on precast reinforced concrete

beams 6 in. wide and 12 in. deep that are mounted on the walls below the roof.  These concrete beams, which are the subject of this report, have developed areas where their surfaces have spalled or scaled to varying degrees.  The sides and the edges of some of these beams have scaled to varying degrees.  The sides and the edges of some of these beams have scaled to a depth of approximately 1/4 inch or more over an area generally not greater than one sq. ft.  It is estimated that only one beam in approximately 20 beams shows any visible signs of spalling.  It is further estimated that on those beams which have spalled, well below 10 percent of their surface area has been damaged.  At the time of this visit none of these beams appeared to have any cracking or structural damage.

*Id*. at 9.

Mr. Tobin also explained that because the storage facility's cooling rooms were intended to keep grapes just above 32 degrees Fahrenheit, the refrigeration coils must operate just below 32 degrees. *Id*. at 10.  As a consequence, water continually condensed on the refrigeration coils and later froze. *Id*.  To combat the ice problem, the refrigeration coils were sprayed twice a day with water warm enough to melt the ice. *Id*.  A considerable portion of that water flowed over the concrete beams used to support the refrigeration coils, causing them to become partially saturated with water on their outer surfaces. *Id*.  The "internal moisture around the outer-surface of the beams [was] susceptible to freezing at the temperatures at which the [refrigeration coils operated]." *Id*.  Mr. Tobin then concluded the beams were likely damaged by the repeated cycle of freezing and thawing experienced near the beam ends connected to the refrigeration coils. *Id*.  To prevent future damage, Mr. Tobin recommended the application of a special epoxy paint to the concrete beams that would seal out water and prevent freezing under the beams' surfaces. *Id*.  Mr. Tobin also explained that had the concrete used in the beams been air-

entrained, the beams would not have been as susceptible to the freezing cycles experienced in the cooling rooms. *Id.* at 14-15.[3]

On November 2, 2001, at Bethlehem's request, Smith-Emory Laboratories produced a draft report in which it discussed what it believed caused the concrete beam damage. (Ct. Rec. 197-4 at 17-20.) Like Mr. Tobin, Smith-Emory Laboratories also believed the above-described freezing cycles, as well as exposure to certain chemicals caused the damage. *Id.* Smith-Emory Laboratories also suggested several repair options, but ultimately concluded the only guaranteed long-term fix would be to replace the concrete beams with new beams constructed of materials resistant to the storage facility's environmental conditions. *Id.*

### 3. Steveco's Claims Against Bethlehem

Sometime in the fall of 2001, Andrew Haut, a Bakersfield, California attorney retained by Bethlehem, requested an explanation from M. Randal Davies, Steveco's attorney, for why Steveco had not paid Bethlehem the remaining balance due under the construction contract for the Phase II work.[4] *See Id.* at 26-29. In response, Mr. Davies, on behalf of Steveco, in the above-mentioned October 5, 2001, letter, detailed the grape damage and construction defects described above and implied Steveco would not

---

[3] Tests conducted by Ash Grove Cement Company confirmed the concrete used to construct the concrete beams was not air-entrained. (Ct. Rec. 197-4 at 16.)

[4] According to Bethlehem's figures, this amount equaled $680,388.18 plus interest. Of this amount, $669,617.18 was owed for the Phase II construction and $10,771.00 was owed for a sign installation. (Ct. Rec. 197-4 at 30.)

ORDER ~ 8

pay Bethlehem the remaining amount due until the damages were accounted for. *Id.*

On January 23, 2002, subsequent to its initial independent attempts to settle with Steveco, Bethlehem provided St. Paul with its first notice of Steveco's construction defect claims. (Ct. Rec. 197-6 ¶ 7.)  On January 30, 2002, Steveco filed a complaint against Bethlehem, Engel & Company, and CalCA in the Kern County Superior Court of California. (Ct. Rec. 174 Ex. 5 at 4-17.)  In its complaint, Steveco alleged Bethlehem, in addition to the other defendants, was liable for breach of contract and negligence, which resulted in its grape loss and various construction defects. *Id.*  In response, Bethlehem filed a counterclaim against Steveco regarding Steveco's nonpayment of funds owed under the Lucich Farms construction contract.  On February 19, 2002, Bethlehem faxed copies of both Steveco's complaint and its counterclaim to Mr. Zimmerman requesting they be transmitted to Transportation, but not St. Paul. (Ct. Rec. 174 Ex. 5 at 2.)  In this fax, Bethlehem explains no answer had been filed by Bethlehem and that it considered the fax to Mr. Zimmerman as a "tender of defense" to Transportation. Id.

On March 4, 2002, because documents previously requested of Bethlehem by St. Paul had not yet been received, St. Paul sent Bethlehem a follow-up that specifically asked for a "complete copy" of Bethlehem's construction file. (Ct. Rec. 197-6 at 15-18.)  In addition, St. Paul informed Bethlehem that (1) the damaged grapes were not covered by the St. Paul policy and (2) the damaged beams would not be covered if the damage was caused by Bethlehem's subcontractors. *Id.*  St. Paul also

discussed its perceived duty to defend Bethlehem against Steveco's grape

and beams claims by stating:

> It is our understanding that you have [ ] reported [the grape
> and beams claims] to your General Liability Carrier, CNA, and
> have asked them to provide a defense, and they have agreed to
> do so.  We would like to point out that under the insuring
> agreements on your CGL Gap Policy the underwriters do not have
> the duty to defend if you are entitled to a defense or
> indemnification of defense costs under any other policy.

*Id.* at 16.  For that reason, St. Paul informed Bethlehem that "if CNA

provides a defense, then [St. Paul] will not." *Id.* at 17.

On March 29, 2002, Bethlehem's Senior Administrative Assistant Kathy

Porrovecchio responded to St. Paul's March 4, 2002, document request by

forwarding St. Paul various construction files and a copy of Steveco's

January 30, 2002, complaint, Bethlehem's February 13, 2002, cross-

complaint, and the Summons Mr. Haut had received on Bethlehem's behalf

in connection with the Steveco action on March 13, 2002. *Id.* at 24-25.

In April 2002, Steveco contracted with Bethlehem for the replacement

of all 128 Phase I concrete beams with stainless steel beams. (Ct. Rec.

190 Exs. 13 & 14.)   Under the contract, Bethlehem was to be paid

$169,748.00. (Ct. Rec. 197-5 at 13.)   Bethlehem allegedly entered into

this contract when Steveco threatened to employ a different contractor

to perform the work for a higher price. *Id.*  On June 3, 2002, Bethlehem

was paid $51,112.29 of the $169,748.00 due on the beam replacement

contract. (Ct. Rec. 197-5 at 32.)   The remaining portion was withheld

because the steel beams were defectively installed. *Id.* at 34.   Thus,

Bethlehem was owed $118,635.71 by Steveco on the beam replacement

contract.

Steveco filed its First Amended Complaint against Bethlehem on April 26, 2002. (Ct. Rec. 174 Ex. 10.)  The First Amended Complaint and the accompanying summons were forwarded to Transportation and St. Paul by Bethlehem on May 17, 2002, with a letter stating: "Defense efforts will now proceed in earnest.  Please advise immediately if you intend to voluntarily help fund the defense." *Id.* at Ex. 11.  On May 29, 2002, St. Paul sought confirmation from Transportation on whether Transportation would be providing Bethlehem with a defense in the underlying Steveco action. (Ct. Rec. 197-6 at 31-32.)

On July 22, 2002, in a letter written by Sandy Marcy, Transportation acknowledged its receipt of the summons and complaint received by Bethlehem from Steveco on March 13, 2002. (Ct. Rec. 174 Ex. 12.)  In this letter, Transportation confirmed the appointment of Dan Crowley of Booth, Mitchel & Strange ("BMS") as defense counsel responsible for defending Bethlehem against Steveco's grape and construction defect claims, but explained BMS would play no role in prosecuting Bethlehem's counterclaim against Steveco. *Id.* Ex. 12 at 1.

On September 12, 2002, in a letter to Bethlehem, St. Paul expressed its belief Transportation was providing Bethlehem with a defense in the Steveco action and requested Bethlehem provide status reports concerning the litigation as the case proceeded forward. (Ct. Rec. 279 at 3.) Bethlehem responded in a letter written on October 8, 2002, stating:

> You are correct in understanding that CNA has indicated it will provide a defense for Bethlehem Construction, Inc. ("Bethlehem").  However, to date CNA has still not reimbursed Bethlehem for any of Bethlehem's defense costs incurred prior to CNA's hiring of defense counsel.  Perhaps CNA will pay those monies one day.  Perhaps not.

ORDER ~ 11

CNA has to date refused to engage *Cumis* counsel.  CNA has to date refused to reimburse Bethlehem for the cost of its affirmative efforts to recover monies being withheld by Steveco based upon Steveco's contention that Bethlehem was negligent.  And finally, counsel engaged by CNA to defend Bethlehem has, as recently as yesterday, been given no instruction that its sole and exclusive duties are to Bethlehem, as would be required under the Washington formulation of the duties of retained counsel, as I understand things.  Rather, engaged counsel is proceeding with the understanding that its duties are to CNA and to Bethlehem are governed by the California formulation, which I understand involves retained counsel owing duties to both the insured and the insurer that are almost coequal.  CNA takes the position that it can manage the defense in this manner because there is "no conflict of interest."  Bethlehem disagrees, contenting there exists an actual conflict of interest between the interests of CNA and Bethlehem.

Based upon the foregoing, you will not be surprised to learn that Bethlehem contends it has not received the "unconditional defense" you mentioned whereupon CNA is "paying all defense costs."  Consequently, you may fairly conclude that the St. Paul Reinsurance Company's argument that Bethlehem is disqualified from defense coverage because Bethlehem has available to it "other valid and collectible defense coverage" is seriously disputed by Bethlehem.

*Id.* at 5-6.

In late 2002 and early 2003, Bethlehem, Bethlehem's insurance carriers, Steveco, and CalCA engaged in mediation discussions that ultimately resulted in a February 24, 2003, global settlement of Steveco's and Bethlehem's respective claims against each other ("Settlement Agreement"). (Ct. Rec. 174 Ex. 18.)  Under the global settlement agreement, Steveco was to be paid $340,000.00 by Transportation, $65,000.00 by St. Paul, $65,000.00 by Evanston,[5] $30,000.00 by Engel & Company, and $30,000.00 by CalCA to satisfy the grape and beam damage claims.  In turn, Steveco was to pay $675,000.00

---

[5] On April 21, 2004, the Court granted Evanston's Motion for Judgment on the Pleadings. (Ct. Rec. 28.)  As a result, Evanston was dismissed from this action. *Id.*

ORDER ~ 12

to Bethlehem presumably in consideration for BCI's Phase II work and the steel beam replacements. *Id.* at 3-4.   Once these amounts were paid, Steveco and Bethlehem respectively agreed to dismiss their claims against each other. *Id.* at 4-5.   The Settlement Agreement was signed by representatives from Steveco, Bethlehem, and the other interested parties. *Id.* at 9-13.

**C. Bethlehem's Claims Against Transportation & St. Paul**

On March 4, 2003, Bethlehem filed suit in the Chelan County Superior Court of Washington against Transportation and St. Paul, alleging the insurance carriers breached their insurance contracts and acted in bad faith in connection with the underlying Steveco action. (Ct. Rec. 1 at 3-15.)   Specifically, Bethlehem alleged Defendants breached their insurance contracts and acted in bad faith by failing to properly defend, investigate, indemnify, and communicate coverage positions throughout the course of the Steveco action. *Id.* As a result, Bethlehem claims it was forced to retain its own defense counsel, which caused it to incur litigation fees and costs allegedly covered by the Transportation and St. Paul Policies. *Id.*   To remedy Defendants' alleged misconduct, Bethlehem seeks the recovery of (1) defense fees and costs associated with the underlying Steveco action; (2) defense fees and costs associated with litigating this action; (3) prejudgment interest; (4) punitive damages; and (5) damages under Washington's Consumer Protection Act. *Id.*   In addition, Bethlehem hopes to recover funds allegedly owed to it by Steveco that Bethlehem claims it was compelled by Transportation and St. Paul to forego payment of as part the global settlement agreement. *Id.* The Chelan County Superior Court case was removed to the Eastern District

of Washington and assigned to this Court on September 11, 2003. (Ct. Rec. 1.)

## II. Standard of Review

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id*. at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id.* There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248. This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any

challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

### III. St. Paul's Breach of Contract Motion

In its Breach of Contract Motion, St. Paul requests summary judgment on each of the breach of contract claims alleged against it in Bethlehem's Complaint. For the reasons stated below, the Court grants each of St. Paul's three separate requests.

**A. Bethlehem's Failure to Defend Claim Against St. Paul**

"The insurer's duty to defend the insured is one of the main benefits of the insurance contract." *Safeco Ins. Co. v. Butler*, 118 Wash. 2d 383, 392 (1992). "[T]he insurer's duty to defend, unlike its duty to pay, arises when the complaint is filed and is to be determined from the allegations of the complaint." *Holland Am. Ins. Co. v. Nat'l Indem. Co.*, 75 Wash. 2d 909, 911-912 (1969). Specifically, the duty to defend "arises when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage." *Unigard Ins. Co. v. Leven*, 97 Wash. App. 417, 425 (1999). "Although the duty to defend is broad, an insurer has no duty to defend claims based on factual allegations that are clearly not covered by the policy." *Woo v. Fireman's Fund Ins. Co.*, 128 Wash. App. 95, 102 (2005).

ORDER ~ 15

In its First Amended Complaint, Steveco broadly alleged Bethlehem, through its own actions and/or those of its subcontractors, was liable for the above-described grape loss and construction defects. (Ct. Rec. 174 Ex. 10.) It is undisputed that these injuries constituted "property damage" under the Transportation Policies. (*See* Ct. Rec. 190 Ex. 1 at 13 & Ex. 2 at 13.) It is also undisputed that if certain facts alleged in Steveco's First Amended Complaint were proved, both the grape loss and constructions defect damages would have been covered by the Transportation Policies. Specifically, had Steveco proved Bethlehem's negligence caused the grape loss, the grape loss would have been covered by the Transportation Policies because the grape loss involved the "loss of use of tangible property that [was] not physically injured[,]" which constituted a type of "property damage" covered by the Transportation Policies. *Id.* Ex. 1 at 2, 13 & Ex. 2 at 2, 13. Additionally, although property damage to Bethlehem's "work" was generally excluded from coverage under the Transportation Policies, the policies nonetheless would have covered the disputed construction defects if the defects arose from work performed on Bethlehem's behalf by subcontractors. *Id.* Ex. 1 at 5 & Ex. 2 at 5. Accordingly, because Steveco's First Amended Complaint alleged facts relating to the grape loss and construction defects, which could, if proved, imposed liability on Bethlehem for property damage covered by the Transportation Policies, Transportation was obligated to defend Bethlehem against Steveco's grape loss and construction defect claims. *Unigard Ins. Co.*, 97 Wash. App. at 425.

Because Transportation was obligated to defend Bethlehem against Steveco's grape loss and construction defect claims, St. Paul, even

though the St. Paul Policy may have covered the alleged construction defects, had no duty to defend Bethlehem in the Steveco action. This is because under the St. Paul Policy, the parties agreed St. Paul was obligated to defend Bethlehem *only* if Bethlehem was "not entitled to a defense or indemnification of defense costs under any other policy or policies of insurance." (Ct. Rec. 252 Exs. A at 4.)   Specifically, the St. Paul Policy provided:

> If [Bethlehem was] entitled to such a defense or indemnification of defense costs under any other policy or policies on insurance, [St. Paul would] have [had] <u>the right but not the duty to defend</u> [Bethlehem] against any "suit" seeking damages because of "property damage" to which [the St. Paul Policy] applie[d].

*Id.* (emphasis added). Thus, as explained above, because Bethlehem was entitled to a defense by Transportation against the claims raised in the Steveco action, Bethlehem's contractual duty to defend never arose and its failure to provide a legal defense for Bethlehem was not a breach of its duty to defend under the St. Paul Policy.

In its response, Bethlehem emphasizes the fact that the St. Paul Policy included a sentence stating that "[i]f no other insurer defends, [St. Paul] will undertake to do so . . . ." (Ct. Rec. 252 Exs. A at 11.) Bethlehem's reliance on this language is misplaced for two reasons. First, because Transportation provided a defense in the Steveco action, the condition precedent, i.e. "[i]f no other insurer defends", was never satisfied.   Thus, any obligation owed by St. Paul under this sentence never became due.   Second, Bethlehem fails to recognize that the above-stated sentence was only part of a larger clause that stated:

> [St. Paul] will <u>have no duty</u> under this policy to defend [Bethlehem] against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer

ORDER ~ 17

1    defends, [St. Paul] will undertake to do so, but [St. Paul]
2    will be entitled to the insured's rights against all those
     other insurers.

3    *Id.* (emphasis added).   Although St. Paul indicates it would defend

4    Bethlehem under certain conditions, its decision to do so is not a duty

5    required by the St. Paul Policy, because as the first sentence of the

6    clause makes clear, St. Paul had *no duty to defend* in any circumstance.

7        Accordingly, because the Court finds no disputed issues of fact

8    regarding St. Paul's obligation to defend Bethlehem in the underlying

9    Steveco action and that as a matter of law St. Paul had *no obligation* to

10   defend, St. Paul is granted summary judgment on Bethlehem's failure to

11   defend claim.

12       **B. Bethlehem's Failure to Indemnify Claim Against St. Paul**

13       The St. Paul Policy required St. Paul "to pay those sums that the

14   insured [became] legally obligated to pay as damages because of 'property

15   damage' to which [the St. Paul Policy applied.]"(Ct. Rec. 252 Exs. A at

16   4.)   In its Breach of Contract Motion, St. Paul argues it is entitled to

17   summary judgment on Bethlehem's failure to indemnify claim because

18   Bethlehem was never "legally obligated" to pay Steveco for property

19   damage definitively covered by the St. Paul Policy.   Although Bethlehem

20   generally refutes St. Paul's assertion, the arguments contained in

21   Bethlehem's response relate to whether St. Paul's duty to act in good

22   faith was breached, rather than whether St. Paul met its contractual

23   indemnification obligations.

24       The Court generally concurs with St. Paul's position.   Because the

25   issue of whether the St. Paul Policy covered any of Steveco's claims was

26   never determined by way of trial, agreement, or otherwise, it is not

reasonable to conclude Bethlehem was ever legally obligated to damages covered by the St. Paul Policy.  Nonetheless, St. Paul's duty to indemnify Bethlehem in the Steveco action was certainly discharged when St. Paul, in conjunction with Bethlehem's other insurers, engaged in the mediation process and paid its portion of the Settlement Agreement.  For this reason and in light of the ruling below, the Court finds St. Paul did not breach its duty to indemnify Bethlehem in the Steveco action and hereby grants this portion of St. Paul's Breach of Contract Motion.

**C. Voluntary Payments Clause Issue**

In numerous pleadings, Bethlehem argues it was owed over $1,000,000.00 by Steveco for work completed during Phase II of the construction project and for the replacement of the storage facilities' allegedly defective concrete beams with steel beams.  Bethlehem also alleges it was "compelled" by St. Paul and Transportation to forego partial payment of the money owed by Steveco to aid the parties in reaching the February 24, 2003, Settlement Agreement.  Specifically, Bethlehem asserts it was forced to accept the reduced payment of $650,000.00 from Steveco and waive its right to collect or sue for the remaining funds Bethlehem believed it was owed by Steveco.  In Bethlehem's opinion, the funds it was allegedly "compelled" to forego[6] should be treated as additional payments by Bethlehem to cover Steveco's grape loss and construction defect claims.  Accordingly, Bethlehem argues St. Paul and Transportation breached their duties to indemnify because

---

[6] If Bethlehem is correct that it was owed over $1,000,000.00 by Steveco, the amount foregone by Bethlehem in the Settlement Agreement exceeded $350,000.00.

ORDER ~ 19

1  the amounts Bethlehem was "compelled" to forego should have been paid by

2  the insurers, and not by Bethlehem.

3      The St. Paul Policy includes the following "voluntary payments

4  clause": "No insured will, except at that insured's own cost, voluntarily

5  make a payment, assume any obligation, or incur any expense without our

6  consent." (Ct. Rec. 139 at 21).   St. Paul believes this clause protects

7  St. Paul from having to indemnify Bethlehem for any alleged counterclaims

8  against Steveco that Bethlehem purports to have waived in the Settlement

9  Agreement.   In general, St. Paul argues that because Bethlehem did not

10  obtain St. Paul's consent to release the alleged counterclaims, Bethlehem

11  breached the voluntary payments clause of the St. Paul Policy.

12  Therefore, as St. Paul explains, Bethlehem's purported release of the

13  Steveco counterclaims must be deemed voluntary and not actionable under

14  the St. Paul Policy.

15      In opposition, Bethlehem's President, Mr. Addleman, states:

16      Prior to settling the underlying lawsuit, whereby Bethlehem was
       compelled to waive claims of more than a quarter of the [sic]
17      million dollars, I raised a tremendous protest.  These were not
       "dubious claims," but rather sums that Steveco legitimately was
18      owed.  It was my belief that Bethlehem had purchased insurance
       that covered the entirety of the risk that confronted it in the
19      underlying lawsuit, and yet the carriers were not willing to
       step forward and collectively make a fair offer to settle the
20      dispute.  Finally, when it became apparent to me in this third
       and final mediation that the only way the underlying lawsuit
21      would settle was for Bethlehem to contribute monies, I made it
       perfectly clear to the carriers that I was doing so under
22      protest, and didn't like it one bit.  Any suggestion by the
       [sic] St. Paul that it did not "consent" to this payment is
23      simply wrong; it and the other insurers not only consented to
       the payment - they compelled it.

24  (Ct. Rec. 252 ¶ 7.)  Based on Mr. Addleman's statement, Bethlehem argues

25  St. Paul is not entitled to summary judgment on the above-described

26  issue.

ORDER ~ 20

As noted above, a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial . . . ." *Anderson*, 477 U.S. at 248.  Here, Bethlehem exclusively relies on Mr. Addleman's assertion that St. Paul consented to Bethlehem's waiver of its counterclaims against Steveco.  No evidence, aside from Mr. Addleman's self-serving statement, is offered to demonstrate St. Paul's actual consent.  For example, Mr. Addleman does not detail any conversations with St. Paul representatives or provide any documentary support for his claim that St. Paul agreed to Bethlehem's waiver of the Steveco counterclaims.  For this reason, Bethlehem fails to meet its burden of demonstrating a genuine issue of material fact exists regarding the issue of whether St. Paul consented to the wavier of the Steveco counterclaims. Accordingly, because Bethlehem is unable to prove St. Paul consented to the waiver, Bethlehem is barred by the St. Paul Policy's voluntary payments clause from suing St. Paul for the recovery of the counterclaims it purportedly waived in the Settlement Agreement.  For this reason, this portion of St. Paul's Breach of Contract Motion is granted.

### IV. St. Paul's Bad Faith Motion

In its Bad Faith Motion, St. Paul moves the Court for an order granting summary judgment in its favor on each bad faith claim asserted against St. Paul in Bethlehem's Complaint.  As noted in Bethlehem's response, Bethlehem's bad faith claims against St. Paul fall into three categories: (1) bad faith claim investigation practices; (2) bad faith failure to defend; and (3) bad faith efforts to achieve a reasonable settlement.  These bad faith categories are separately addressed below.

**A. Bad Faith Investigative Practices**

On February 5, 2002, St. Paul sent Jeffery Coleman, a licensed engineer, concrete specialist, and attorney, to the Lucich Farms work site to meet with others to discuss the purported construction defects.(Ct. Rec. 197-2 at 3.)  When Mr. Coleman arrived at the work site, he introduced himself as an engineer, but failed to inform those in attendance that he was a practicing attorney. *Id.*  After lunch, Mr. Coleman handed out business cards, which indicated he was an engineer and an attorney. *Id.* at 4.  Bethlehem's President, Mr. Addleman, and its Washington attorney, Joel McCormick, were also in attendance at this meeting. *Id.*  Bethlehem claims there were times prior to lunch when Mr. Addleman and Mr. Coleman talked outside the presence of Mr. McCormick.

In its Complaint, Bethlehem alleges Mr. Coleman's failure to notify Mr. Addleman that he was an attorney at the outset of the meeting constituted an ethical violation of his duties as a attorney and should be considered a bad faith investigative practice by St. Paul.  St. Paul disagrees with Bethlehem's assessment and now asks the Court to find Mr. Coleman's conduct did not constitute bad faith.

Claims of bad faith are essentially tort claims and as such, proponents of those claims must demonstrate "the alleged wrongful act caused harm." *Safeco Ins. Co. of Am. v. Butler*, 118 Wash. 2d 383, 389 (1992).  In its Bad Faith Motion, St. Paul asserts it is entitled to summary judgment on the bad faith claim related to Mr. Coleman's conduct because Bethlehem is unable to prove it was harmed by Mr. Coleman's actions during the February 5, 2002, meeting.  In opposition, Bethlehem cites the general proposition asserted in *Kirk v. Mr. Airy Ins. Co.*, 134

Wash.2d 558 (1998), that harm is presumed in bad faith cases against insurers.  In light of the Washington Supreme Court's subsequent ruling in *Coventry Associates v. American States Insurance Co.*, 136 Wash. 2d 269, 281 (1998), Bethlehem's reliance on *Kirk* is misplaced.  The Court in *Coventry Associates* explained that the presumption of harm in bad faith cases brought against insurers is a narrow remedy reserved for bad faith conduct related to the insurer's duty to defend. 136 Wash. 2d at 281-82.  Thus, the Court does not presume Mr. Coleman's conduct, which was unrelated to St. Paul's duty to defend, harmed Bethlehem.  For this reason and because Bethlehem failed to demonstrate it was harmed by Mr. Coleman's conduct, which is required to prove a claim of bad faith, the Court grants this portion of St. Paul's Bad Faith Motion.

**B. Bad Faith Failure to Defend**

Earlier in this Order, the Court found St. Paul had no duty to defend Bethlehem in the underlying Steveco action.  For that reason, the Court need not address the issue of whether St. Paul's failure to provide a defense constituted bad faith.  Accordingly, this portion of St. Paul's Bad Faith Motion is denied as moot.

**C. Bad Faith Effort to Achieve a Reasonable Settlement**

In its Bad Faith Motion, St. Paul requests summary judgment on any claims its conduct during the settlement process of the Steveco action constituted bad faith.  In its response to the Bad Faith Motion, Bethlehem limits its settlement-based claims of bad faith to an assertion that St. Paul's decision to not attempt to settle the Steveco claims until November 21, 2002, constituted bad faith.  Specifically, Bethlehem

1    claims St. Paul's purportedly tardy settlement efforts violated W.A.C.

2    § 284-30-330(6).

3         To prevail on any bad faith against an insurer, the insured must

4    show an "insurer's breach of the insurance contract was 'unreasonable,

5    frivolous, or unfounded.'" *Overton v. Consol. Ins. Co.*, 145 Wash. 2d 417,

6    433 (2002) (quoting Kirk, 134 Wash. 2d at 560).  Under W.A.C. § 284-30-

7    330(6), it is an unfair or deceptive act or practice in the business of

8    insurance to "[n]ot attempt in good faith to effectuate prompt, fair and

9    equitable settlements of claims in which liability has become reasonably

10   clear."

11        Based on the evidence contained in the record, the Court concludes

12   that no reasonable jury could find St. Paul's decision to not attempt to

13   settle the Steveco claims until November 21, 2002, was an unreasonable

14   breach of any obligation owed to Bethlehem under the St. Paul Policy.

15   To begin, Bethlehem has no cited no case in which an insurer has been

16   found liable for bad faith because it did not attempt to settle claims,

17   for which the potential damages were within the policy limits, soon

18   enough.

19        Second, the time line of events relating to St. Paul's involvement

20   in the Steveco action demonstrates that Bethlehem's inaction, and not

21   that of St. Paul should be blamed for St. Paul's delayed attempts to

22   settle the Steveco construction defect claims.  First, despite the fact

23   Bethlehem knew of Steveco's construction defect claims since October 5,

24   2001 (Ct. Rec. 174 Ex. 1), Bethlehem did not notify St. Paul of the

25   defect claims under January 23, 2002 (Ct. Rec. 197-6 at 7).  Thereafter,

26   on January 30, 2002, March 4, 2002, and March 19, 2002, St. Paul made

specific requests for documents related to Steveco's construction defect claims, e.g. Bethlehem's construction file. *Id.* at 9-11, 15-18, & 22-23. These requests were ignored by Bethlehem until March 29, 2002, when the requested documents and Steveco's original complaint, which was filed on January 30, 2002, were faxed to St. Paul for the first time. *Id.* at 24-25. Bethlehem's failure to provide St. Paul with the requested documents frustrated St. Paul's ability to determine whether the alleged construction defects were covered by the St. Paul Policy, which prevented St. Paul from engaging is settlement negotiations.

Third, numerous coverage issues existed regarding whether the alleged construction defects were covered by the St. Paul Policy. These issues included, but were not limited to, questions of (1) whether the cause of the concrete beam spalling should be attributed to design error, which would not have been covered by the St. Paul Policy, or a manufacturing flaw, which may have been covered by the St. Paul Policy; (2) whether the beam repairs were covered by Bethlehem's original product warranty, in which case the repairs would not have been covered by the St. Paul Policy; and (3) whether there was coverage for the replacement of all 128 concrete beams, when only five of the beams were spalling.

Thus, in light of the absence of controlling case law on this issue, the delay caused by Bethlehem's failure to promptly provide St. Paul with documentation necessary for determining whether the St. Paul Policy covered the alleged construction defects, and the complexity of the coverage issues presented by the construction defects, the Court does not believe a reasonable jury could find St. Paul's failure to attempt to settle the Steveco claims until November 21, 2002, was unreasonable.

Furthermore, due to the above-described coverage issues, the Court does believe St. Paul's liability for the alleged construction defects had become reasonably clear prior to November 21, 2002. For this reason, Bethlehem's claim that St. Paul violated W.A.C. § 284-30-330(6) is rejected. Accordingly, this portion of St. Paul's Bad Faith Motion is granted. *See Overton*, 145 Wash. 2d at 433.

Accordingly, **IT IS HEREBY ORDERED:**

1. St. Paul's Breach of Contract Motion **(Ct. Rec. 191)** is **GRANTED.**

2. St. Paul's Bad Faith Motion **(Ct. Rec. 192)** is **GRANTED IN PART** (Mr. Coleman's conduct and St. Paul's settlement conduct) and **DENIED AS MOOT IN PART** (St. Paul's decision to not provide a defense).

3. St. Paul's Motion for Partial Summary Judgment Regarding Rescission of 2001 Cgl Gap Policy **(Ct. Rec. 135)** is **DENIED AS MOOT** in light of the Court's rulings.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this ___22nd___ day of January 2007.


                    _____s/Edward F. Shea_____
                           EDWARD F. SHEA
                    United States District Judge



Q:\Civil\2003\0324.MSJ.st.paul.breach.of.contract.&.bad.faith.wpd