UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BETHLEHEM CONSTRUCTION, INC., a Washington corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>TRANSPORTATION INSURANCE COMPANY, a foreign corporation,<br><br>        Defendant. | NO. CV-03-0324-EFS<br><br>**ORDER GRANTING TRANSPORTATION'S REPLACEMENT COSTS MOTION** |

Before the Court, without oral argument, is Transportation Insurance Company's ("Transportation's") Motion for Partial Summary Judgment on Indemnity Coverage for Bethlehem Construction Inc.'s Replacement of Phase I Beams ("Replacement Cost Motion") (Ct. Rec. 186). After reviewing the submitted materials and relevant authority, the Court is fully informed and hereby grants Transportation's motion.[1]

///
///
///
///

---

[1] During the June 10, 2005, hearing, the Court announced that Transportation's Replacement Cost Motion was denied. This Order supercedes the Court's June 10, 2005, announcement.

ORDER ~ 1

# I. Background[2]

## A. The Transportation Insurance Policies

In 1999 and 2000, Bethlehem Construction Inc. ("BCI") purchased insurance policies underwritten by Transportation that covered risks associated with construction projects BCI was involved with. Under the "Coverage A Bodily Injury and Property Damage Liability" sections of Transportation Commercial General Liability Insurance Policies No. C1082227545 ("Transportation Policies"),[3] Transportation agreed to "pay those sums that [Bethlehem] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which [the Transportation Policies applied]." (Ct. Rec. 190 Exs. 1 at 2 & 2 at 2.)

The Transportation Policies define "property damage" as follows:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

*Id.* Ex. 1 at 13 & Ex. 2 at 13.

## B. The Underlying Construction Project & Insurance Claims

In its Order Granting In Part and Denying In Part Transportation's Prejudgment Interest Motion among other ruling (Ct. Rec. 530), the Court

---

[2] In ruling on a motion for summary judgment, the Court considers the facts and all reasonable inferences therefrom as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1972) (*per curiam*). The following factual recitation was created with this standard in mind.

[3] Aside from the policy periods, the terms and conditions set forth in the two Transportation Policies appear to be identical.

ORDER ~ 2

extensively discussed the history of the underlying contractual relationship and related litigation between BCI and Steveco. The parties are familiar with that recitation and have submitted little of that same history in connection with this motion. For ease of discussion and to give context to it, the Court includes some brief excerpts from that earlier Order with citations to documents submitted in support of the motions resolved in that Order.

In early 2000, BCI contracted with Steveco, Inc. ("Steveco") to design and build a cold storage facility in Bakersfield, California ("storage facility"). (Ct. Rec. 174 Ex. 18 at 1.)  The storage facility was to be used by Lucich Farms Cold Storage, LLC ("Lucich Farms") for the storage of table grapes. *Id.*  Under the construction contract, BCI was to design and construct the storage facilities' buildings. *Id.*  The storage facility was constructed in two phases ("Phase I and Phase II"). *Id.*  Phase I commenced in early 2000 and ended on August 22, 2000, when the portion of the storage facility constructed during Phase I was opened for operation. *Id.*  Phase II was completed in the fall of 2001. *Id.* at 2.

In a letter dated October 5, 2001, Steveco provided BCI with formal notice of certain Phase I construction defects it believed BCI was responsible for correcting. *Id.* Ex. 1 at 3-4.  These defects included:

> (a) the concrete support beams for the refrigeration unit that have corrosion problems; (b) rusting black iron supports of the sprinkler system; (c) painting of rooms 3, 4, 7, 8 and the precooler; and (d) caulking of bunkers, specifically for leaks from room 5 to 7, and various leaks and open areas in the precooler.

*Id.*

ORDER ~ 3

Later on October 5, 2001, at BCI's request, structural engineer and concrete consultant Robert E. Tobin inspected the concrete beams complained of by Steveco and prepared a report of his findings and recommendations. (Ct. Rec. 197-4 at 8-15.) In his report, Mr. Tobin described the damaged concrete beams as follows:

> The separate cooling systems consist of a network of horizontal aluminum refrigeration coils located near the roof. These coils in turn are supported on precast reinforced concrete beams 6 in. wide and 12 in. deep that are mounted on the walls below the roof. These concrete beams, which are the subject of this report, have developed areas where their surfaces have spalled or scaled to varying degrees. The sides and the edges of some of these beams have scaled to a depth of approximately 1/4 inch or more over an area generally not greater than one sq. ft. It is estimated that only one beam in approximately 20 beams shows any visible signs of spalling. It is further estimated that on those beams which have spalled, well below 10 percent of their surface area has been damaged. At the time of this visit none of these beams appeared to have any cracking or structural damage.

*Id.* at 9.

Mr. Tobin also explained that because the storage facility's cooling rooms were intended to keep grapes just above 32 degrees Fahrenheit, the refrigeration coils must operate just below 32 degrees. *Id.* at 10. As a consequence, water continually condensed on the refrigeration coils and later froze. *Id.* To combat the ice problem, the refrigeration coils were sprayed twice a day with water warm enough to melt the ice. *Id.* A considerable portion of that water flowed over the concrete beams used to support the refrigeration coils, causing them to become partially saturated with water on their outer surfaces. *Id.* The "internal moisture around the outer-surface of the beams [was] susceptible to freezing at the temperatures at which the [refrigeration coils operated]." *Id.* Mr. Tobin then concluded the beams were likely damaged by the repeated cycle

ORDER ~ 4

of freezing and thawing experienced near the beam ends connected to the refrigeration coils. *Id.* To prevent future damage, Mr. Tobin recommended the application of a special epoxy paint to the concrete beams that would seal out water and prevent freezing under the beams' surfaces. *Id.* Mr. Tobin also explained that had the concrete used in the beams been air-entrained, the beams would not have been as susceptible to the freezing cycles experienced in the cooling rooms. *Id.* at 14-15.[4] (Conclusion of the recitation from Ct. Rec. 530.)

In April 2002, Steveco contracted with BCI for the replacement of all 128 Phase I concrete beams with stainless steel beams. (Ct. Rec. 190 Exs. 13 & 14.)  Under the contract, BCI was to be paid $169,748.00. (Ct. Rec. 197-5 at 13.)  BCI allegedly entered into this contract when Steveco threatened to employ a different contractor to perform the work for a higher price. *Id.*

**C. Settlement Agreement**

In late 2002 and early 2003, BCI, BCI's insurance carriers, Steveco, and others engaged in mediation discussions that ultimately resulted in a February 24, 2003, global settlement of Steveco's and BCI's respective claims against each other ("Settlement Agreement"). (Ct. Rec. 190 Ex. 20.)  Under the global settlement agreement, Steveco was to be paid $340,000.00 by Transportation, $65,000.00 by St. Paul, $65,000.00 by Evanston,[5] $30,000.00 by Engel & Company, and $30,000.00 by CalCA to

---

[4] Tests conducted by Ash Grove Cement Company confirmed the concrete used to construct the concrete beams was not air-entrained. (Ct. Rec. 197-4 at 16.)

[5] On April 21, 2004, the Court granted Evanston's Motion for Judgment on the Pleadings. (Ct. Rec. 28.)  As a result, Evanston was

ORDER ~ 5

satisfy the grape and beam damage claims. In turn, Steveco was to pay $675,000.00 to BCI presumably in consideration for BCI's Phase II work and the steel beam replacements. *Id.* at 3-4. Once these amounts were paid, Steveco and BCI respectively agreed to dismiss their claims against each other. *Id.* at 4-5. The Settlement Agreement was signed by representatives from Steveco, BCI, and the other interested parties. *Id.* at 9-13.

## II. Standard of Review

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id*. at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id.* There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249.

---

dismissed from this action. *Id.*

ORDER ~ 6

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248. This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

### III. Analysis

BCI claims Transportation was obligated by the Transportation Policies to indemnify BCI for the costs associated with replacing all 128 Phase I beams with 128 new stainless steel beams and that because Transportation allegedly did not indemnify BCI for the replacement costs, Transportation breached its indemnification duties under the Transportation Policies.

In a breach of contract claim brought by an insured against its insurer, the insured carries the burden of bringing itself "within the provisions of the policy under consideration." *Greene v. St. Paul-Mercury Indemn. Co.*, 51 Wash. 2d 569, 574 (1958). For this reason, to prevail on its claim Transportation breached the Transportation Policies by

ORDER ~ 7

failing to cover the replacement costs, BCI must prove the replacement costs were covered losses under the Transportation Polices. If BCI is unable to prove the replacement costs were covered losses under the Transportation Policies, Transportation may not be found liable on this indemnity claim. *Schwindt v. Underwriters at Lloyd's of London*, 81 Wash. App. 293, 298 (1996).

In both Transportation Policies, BCI and Transportation agreed Transportation would "pay those sums that the insured becomes *legally obligated* to pay as damages because of . . . 'property damage' to which" the Transportation Policies applied. (Ct. Rec. 190 Ex. 1 at 2 & Ex. 2 at 2) (emphasis added). Transportation argues that it is undisputed that no property damage was discovered within the 1999-2000 policy period, which is correct. Accordingly, Transportation's motion for summary judgment is granted in part: there is no coverage under the 1999-2000 policy.

As to the property damage discovered during the second policy period, 2000-2001, at least 15 beams showed signs of spalling according to those who examined the beams, which was confirmed by BCI's project manager, Carlos Pascual, both in written faxes and memos as well as in his deposition. Transportation's position is that, at most, only the costs of replacing 15 beams is arguably covered as property damage during the second policy period which ended December 31, 2001, and then "the measure of damages for the breach of a building construction contract is ordinarily such sum as is required to make the building conform to the contract." *Kithchel v. Acre*, 216 Cal App. 2d 119, 123 (1963). Here, that would not require replacement of the beams with stainless steel beams, but rather repair of the fifteen spalled beams. And then only if BCI can

ORDER ~ 8

demonstrate that it was "legally obligated" to pay for those repairs as required by the contract. Transportation argues further that BCI has no evidence of such a legal obligation, it fails to carry its *Celotex* burden, and therefore, Transportation is entitled to summary judgment that there is no coverage for the Phase I beams. Finally, Transportation asserts that the "Sistership Exclusion" in the policies bars recovery for any of the costs of the beam replacement.

As BCI must come forward with affidavits based on personal knowledge or other admissible evidence to create a genuine issue of material fact in order to defeat the motion for summary judgment, it offered the Declaration of Mike Addleman of BCI (Ct. Rec. 234) and the Declaration of Joel McCormick, BCI's attorney at that time, with attachments (Ct. Recs. 233-1, 233-2, 233-3) on the issue of the spalling of the concrete beams and their number as the basis for its claims for indemnity for the cost of replacing the concrete beams with 128 stainless steel beams. As to the Declaration of Mr. Addleman, it is evident that Mr. Addleman is not an expert on spalling or on the need for replacement with stainless steel beams and that his assertion regarding both of those points is not based on personal knowledge. Therefore, those assertions are not admissible evidence of either point because they are not based on personal knowledge or on expert opinion and are in violation of the personal knowledge requirements of Federal Rule of Evidence 602[6] and 702[7]

---

[6] "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602.

[7] "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient

ORDER ~ 9

nor in compliance with the similar requirement of Federal Rule of Civil Procedure 56(e).[8] Finally, they are contradicted by his November 4, 2004, deposition testimony about the observations of his project manager, Carlos Pascual, contained in the report of Mr. Pascual which was an exhibit to that deposition. During his deposition, Mr. Addelman admitted that he had not seen the beams in the Steveco facility that were spalling, and that he agreed with Mr. Pascual's November, 2001, report that indicated only 15 of the 128 beams were spalling. (Ct. Rec. 296-2, the pertinent deposition excerpts attached to the declaration of Transportation counsel (Ct. Rec. 296-1) that these excerpts were true and correct copies of that deposition). One cannot utilize a later declaration of a witness to create a genuine issue of fact and thereby defeat a motion for summary judgment which contradicts earlier deposition testimony by that same witness. *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir. 1991). Accordingly, BCI's use of the Addleman Declaration is unavailing.

As to the McCormick Declaration, to it are attached unsworn reports of two different engineers, one of whom, Mr. Coleman, apparently inspected the Lucich Farm facility in which the beams were installed on January 5, 2002, the Transportation policy having expired on December 31, 2001, and did so for St. Paul. His report is unsworn and therefore,

---

facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702.

[8] "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e).

ORDER ~ 10

arguably inadmissible to create a genuine issue of material fact because it is hearsay on the point of the condition of the beams and the number affected. Assuming arguendo that it could be considered because of an unspecified exception in Federal Rule of Evidence 803, nothing in it establishes the necessity for replacement of all 128 beams, let alone the necessity for replacement with stainless steel beams. Neither does the report of the other engineer, Mr. Engel; it is also unsworn and arguably hearsay. Again assuming arguendo that it could be considered because of an unspecified exception in Rule 803, there is nothing in it which supports BCI's position that all 128 beams were damaged nor that their replacement with stainless steel was necessary to fulfill its contractual obligation. Further, nothing in the McCormick declaration or the related memorandum (Ct. Rec. 231) argues that these reports are admissible as an exception to the hearsay rule and there is no doubt that they are submitted for the truth of their contents. Therefore, there is no evidence that all 128 beams were damaged during the policy period of 2000-2001 and there is no evidence that BCI had a duty to fulfill its contract obligation by replacing all of the beams with stainless steel beams. BCI has failed to carry its *Celotex* burden of coming forward with evidence showing that the damage occurred within the policy periods and that it was legally obligated to pay as damages the cost of the replacement of the 128 beams and that it was improperly denied indemnity coverage on the beam replacement costs. *Greene*, 51 Wash. 2d at 574. Accordingly, Transportation is granted summary judgment on BCI's replacement costs indemnity claim for both policy periods.

Finally, the Court notes that BCI is not saved by the fact that Steveco independently decided it needed to replace the beams. A contractor is not legally obligated to repair defective work or products simply because a contractee deems work or a product to be defective or in need of a particular repair. The contractor is bound by its contract and the obligation to pay the measure of damages needed to make "the building conform to the contract." *Kitchel*, 216 Cal. App. 2d at 123. Here, despite the opportunity to offer evidence that beam replacement was required to bring the storage facility into conformity with its construction contract with Steveco, BCI offers none.

Accordingly, **IT IS HEREBY ORDERED**: Transportation's Replacement Costs Motion **(Ct. Rec. 186)** is **GRANTED**.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this ___7th___ day of March 2007.


                        S/ Edward F. Shea
                        EDWARD F. SHEA
                   United States District Judge


Q:\Civil\2003\0324.MSJ.tic.replacement.costs.2.wpd

ORDER ~ 12