UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BETHLEHEM CONSTRUCTION, INC., a Washington corporation,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>TRANSPORTATION INSURANCE COMPANY, a foreign corporation,<br><br>　　　　　Defendant. | NO. CV-03-0324-EFS<br><br>**ORDER GRANTING TRANSPORTATION'S MOTION ON INCREASED INSURANCE COSTS** |

　　　Before the Court is Transportation Insurance Company's ("Transportation's") Motion for Partial Summary Judgment to Dismiss Bethlehem Construction, Inc.'s ("BCI's") Claims for Increased Insurance Costs (Ct. Rec. 180). The Court has reviewed the memoranda filed by the parties, listened to the arguments of counsel and now GRANTS the motion for the reasons that follow.

///
///
///

ORDER ~ 1

# I. Background[1]

In early 2000, BCI and California Controlled Atmosphere ("CalCA") entered into separate construction contracts with Stevco, Inc. ("Stevco") to jointly design and build a cold storage facility in Bakersfield, California ("storage facility"). (Ct. Rec. 174 Ex. 18 at 1.) The storage facility was to be used by Lucich Farms Cold Storage, LLC ("Lucich Farms") for the storage of table grapes. *Id.* The storage facility was constructed in two phases ("Phase I and Phase II"). *Id.* Phase I commenced in early 2000 and ended on August 22, 2000, when the portion of the storage facility constructed during Phase I was opened for operation. *Id.* Phase II was completed in the fall of 2001. *Id.* at 2.

A. Damaged Grapes

On July 23, 2001, during Phase II of the project, a layer of white powder was discovered on 23,362 boxes of grapes being stored in a pre-cooling room constructed during Phase I. (Ct. Rec. 174 Ex. 1 at 1.) Prior to the discovery of the powder, the grapes had a wholesale market value of $350,337.00. *Id. Ex. 1 at 2.* The powder had a "paint-like feel and appearance, and since Bethlehem's painters had been present and working at the site for several days, grape shipments were halted and Bethlehem was contacted." *Id.* Ex. 1 at 1.

BCI, as lead contractor, assumed the responsibility of determining the source of the powder. *Id.* Ex. 1 at 2. BCI began its investigation

---

[1] A detailed explanation of the facts of this case was provided in Court Record 530. This background is taken from portions of Court Record 530 and is limited to those facts necessary for adjudication of the instant motion.

ORDER ~ 2

by contacting Transportation on July 25, 2001, to report the grape damage as a claim under its insurance policy with Transportation. *Id.* Ex. 3 at 2. That same day, Transportation, through an independent adjuster, commenced its own investigation of the mysterious white powder. *Id.* BCI also hired Forensic Analytical to test several samples of the powder in an effort to determine its chemical makeup and source. *Id*. Ex. 1 at 1. On July 27, 2001, Forensic Analytical issued a report indicating the powder consisted of 9.01% paint pigment and 29.73% aluminum corrosion. *Id.* A follow-up report contradicted the first report concerning the amount of paint pigment, but continued to indicate the presence of a high concentration of aluminum corrosion. *Id.* Due to the presence of the powder, the grapes were considered unfit for consumption or sale by Lucich Farms until clearance was given by a qualified laboratory for their use. *Id.* Ex. 1 at 2.

Because Lucich Farms had not completed a full inventory of the grapes on July 23, 2001, Transportation retained Greer & Kirby to complete an inspection and lot inventory. *Id*. Ex. 3 at 2. Greer & Kirby's inventory began on August 7, 2001, and concluded on August 9, 2001. *Id.* Upon completion of the inventory, Transportation claims it was told by Mike Ahumada of Lucich Farms that the grapes could be maintained as long as three months after the harvest. *Id.* Nothing in the pleadings contradicts Transportation's assertion. At that time, Rob Staniford of Jim Buckley & Associates, Transportation's adjuster, informed Mr. Ahumada that Transportation would abide by the sale of any salvage, but would not accept liability until its investigation was complete. *Id.*

ORDER ~ 3

On August 23, 2001, thirty days after the mysterious white powder was discovered on the grapes, Associated Laboratories, a laboratory retained by Transportation, issued a report stating the grapes "were found to be fit for human consumption if properly and completely rinsed." *Id.* Ex. 1 at 2. However, by that time, the grapes had aged considerably, and their condition was too poor for normal sale. Only $15,700.00 was received through a salvage sale. *Id.* The final grape-related loss totaled $334,637.00. There is no evidence that the delay between July 25, 2001, the date BCI notified Transportation of the grape damage issue, and August 23, 2001, the date Transportation's expert declared the grapes fit for human consumption, was unreasonable or that Transportation's conduct caused the loss of the grapes. In a December 5, 2001, letter, Transportation advised BCI that there was no evidence that identified BCI as the party causing the damage to the grapes and the claim was been denied on that basis. *Id.* Ex. 3. The issue of beam corrosion was referenced in that same letter as Mr. Davies, Stevco's attorney, had identified that additional issue in an October 5th letter to Andrew Haut, BCI's attorney. *Id.* Ex. 1 at 3.

B. Construction Defects

That October 5, 2001, letter from Mr. Haut, Stevco's attorney, provided BCI with formal notice of certain Phase I construction defects and requested their repair. *Id.* Ex. 1 at 3-4. These defects included:

> (a) the concrete support beams for the refrigeration unit that have corrosion problems; (b) rusting black iron supports of the sprinkler system; (c) painting of rooms 3, 4, 7, 8 and the precooler; and (d) caulking of bunkers, specifically for leaks from room 5 to 7, and various leaks and open areas in the precooler.

*Id.*

ORDER ~ 4

Stevco, BCI, Transportation and others attempted to find the cause of and solution for this beam corrosion problem as the record amply demonstrates. Tension between Transportation and BCI was due to the fact that Stevco owed BCI $791,513.16 for work on this project which Stevco refused to pay. *Id.* Ex. 2 at 3. By October of 2001, the beam corrosion issue was an additional complication to the unresolved grape damage claim leading Stevco's attorney to state in his letter to counsel for BCI,

> until the cause of the powder has been conclusively determined, or at least until it is concluded that the problems caused by its presence can be remedied, then some defect must exist, whether in design, materials or construction. Stevco cannot be expected to pay in full for a facility that is known to be defective.

(Ct. Rec. 174 Ex. 1 at 3.) This passage also demonstrates that as of October 5, 2001, neither the cause of the white powder on the grapes nor the party responsible for it were known.

As late as December of 2001, Bobbie Jennings, claims Specialist for Transportation told BCI, "I spoke with Attorney Randel Davies who represents Stevco and he indicated he is not certain Stevco is pursuing a claim involving the beams as they have been working with Bethlehem in regard to a resolution." *Id.* Ex. 3 at 2. However, in January of 2002, Stevco filed its original complaint asserting various claims against BCI and other entities that had worked on this project. *Id.* Ex. 5 at 3. The complaint did not name Transportation. *Id.* In March of 2002, Mr. McCormick notified BCI's insurers that it had made a settlement offer to Stevco though it did not expect acceptance because there was no agreement on the beam repair. *Id.* Ex. 6 at 2.

ORDER ~ 5

In a later March letter, Mr. McCormick noted that even at that late date, Stevco was asserting a new theory of BCI's responsibility for the grape loss. *Id.* Ex. 8 at 2.

In April, Stevco filed an Amended Complaint adding no new parties. *Id.* Ex. 10.

In late 2002 and early 2003, BCI, BCI's insurance carriers, Stevco, and CalCA engaged in mediation discussions that ultimately resulted in a February 24, 2003, global settlement of Stevco's and BCI's claims. (Ct. Rec. 174 Ex. 18.)  Under the global settlement agreement, Stevco was to be paid $340,000.00 by Transportation, $65,000.00 by St. Paul,[2] $65,000.00 by Evanston,[3] $30,000.00 by Engel & Company, and $30,000.00 by CalCA to satisfy the grape and beam damage claims.  In turn, Stevco was to pay $675,000.00 to BCI in consideration for BCI's Phase II work and the steel beam replacements. *Id.*

C. BCI's Claims Against Transportation

On March 4, 2003, BCI filed suit in the Chelan County Superior Court of Washington against Transportation, alleging the insurance carrier breached its insurance contracts and acted in bad faith in connection

---

[2] On January 22, 2007, the Court granted in part a motion by St. Paul Reinsurance Company, Ltd., effectively eliminating claims against that carrier.  Subsequently, on January 25, 2007, St. Paul was dismissed from this action.

[3] On April 21, 2004, the Court granted Evanston's Motion for Judgment on the Pleadings. (Ct. Rec. 28.)  As a result, Evanston was dismissed from this action. *Id.*

ORDER ~ 6

with the underlying Stevco action. (Ct. Rec. 1 at 3-15.) Specifically, BCI alleged Transportation breached its insurance contracts and acted in bad faith by failing to properly defend, investigate, indemnify, and communicate coverage positions throughout the course of the Stevco action. *Id.* As a result, BCI claims it was forced to retain its own defense counsel, which caused it to incur litigation fees and costs allegedly covered by the Transportation and St. Paul Policies. *Id.* To remedy Defendant's alleged misconduct, BCI sought the recovery of (1) defense fees and costs associated with the underlying Stevco action; (2) defense fees and costs associated with litigating this action; (3) prejudgment interest; (4) punitive damages; and (5) damages under Washington's Consumer Protection Act. *Id.* In addition, BCI hoped to recover funds allegedly owed to it by Stevco that BCI claims it was compelled by Transportation and St. Paul to forego payment of as part the global settlement agreement. *Id.* The Chelan County Superior Court case was removed to the Eastern District of Washington and assigned to this Court on September 11, 2003. (Ct. Rec. 1.)

At issue in the instant motion is $522,017.41 BCI seeks in insurance premium increases based on the alleged bad faith conduct of Transportation (Ct. Rec. 185-5 at 10). BCI contends that "through it's [sic] insurer's bad-faith conduct in not offering enough to settle early, and in not paying soon enough it suffered consequential damages." (Ct. Rec. 240 at 7.) The basic premise of BCI's argument appears to be as follows: (1) Transportation could have settled the claim earlier for less money, (2) had Transportation settled earlier for less money, BCI's loss ratio would have been lower, and (3) if BCI's loss ratio were lower, it

would not have had to pay the increased premiums it has been subject to since the Stevco claim was settled in 2003. Transportation challenges this claim.

## II. Standard of Review

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id.* at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under the governing law." *Id.* There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248. This requires the party opposing summary judgment to present or identify

ORDER ~ 8

in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

## III. Analysis

The arguments in Transportation's motion challenging BCI's claims for increased insurance premiums can be divided into two primary claims: (1) that case law does not permit liability against an insurer when the insurer reaches a settlement agreement with a third party settling a claim against the insured, and that settlement falls within the policy limits of the insurance coverage, and (2) that BCI has not demonstrated that Transportation's actions caused the increased premiums.

BCI responds by arguing that in the context of a bad faith claim, an insurance company is liable for any harm that flows from the insurer's wrongful conduct regardless of whether a settlement was made within policy limits. With respect to whether or not Transportation caused the increased premiums, BCI argues that given disputed testimony on the subject, an issue of material fact remains for the jury.

A. Liability for Bad Faith Settlement

The briefing by the parties on this issue evaluates the possibility of an insurance provider's liability in the context of a settlement under both Washington and California law. While there is no demonstrated

ORDER ~ 9

conflict of laws, California case law is more developed on this issue and thus provides guidance even if Washington law is found ultimately to be controlling.

In general "an insurer normally cannot be liable to the insured if the insurer does no more than settle a claim or suit within the policy limits," *W. Polymer Tech., Inc., v. Reliance Ins. Co.,* 32 Cal. App. 4th 14, 24 (1995); *see also Security Officers Serv., Inc., v. State Compensation Ins. Fund,* 17 Cal. App. 4th 887, 895 (1993). BCI's claim in this context is a novel one, BCI claims that despite Transportation's settlement of the claims against BCI within the policy limits and without subjecting BCI to any direct costs as a result of the settlement, BCI should still be liable for later increased insurance premiums that BCI alleges are the result of Transportation's failure to settle the claim earlier.

There are several exceptions to the general rule that an insurer is not be liable for bad faith if the insurer settles a claim within policy limits. The common thread in each exception is that the negotiated settlement, while within policy limits, subjects the insured to some direct cost or denies the insured an expected benefit. The Court in *Western Polymer* examined a number of exceptions to the general rule. 32 Cal. App. 4th at 24-26. For example, in *Ivy v. Pacific Automobile Ins. Co.,* 156 Cal. App. 2d 652 (1958), when an insurer reached a settlement in excess of the policy limits, and the settlement was not consented to by the insured, the insurer violated the its duty of good faith. In another example, when the insurer negotiated away the insured's claim for personal injuries, the insurer could be subject to liability for bad

faith, despite the fact that the settlement was within policy limits. *Rothrock v. Ohio Farmers Ins. Co., et al.,* 223 Cal. App. 2d 616 (1965); *Barney v. Aetna Casualty and Surety Co.,* 185 Cal. App. 3d 966 (1986).

*Western Polymer* then discussed *Security Officers Service, Inc. v. State Compensation Ins. Fund,* 17 Cal. App. 4th 887 (1993), the case most closely analogous to the instant case. In *Security Officers*, the insured sought damages for increased premiums due to the insurer's alleged bad faith handling of claims despite the fact that the insurer had not subjected its insured to liability in excess of policy limits or negotiated away the insured's personal injury claims. However, in that case, the trial court denied amendment of the complaint and dismissed the action on several grounds. On appeal, it was held that the plaintiff's allegations that the insurer's failure to timely resolve claims adversely affected the policyholders's enjoyment of *the policy's* benefits and purposes stated a claim. *Id.* at 895, 900. Specifically, the calculation of premiums paid in the policy at issue in that case was based on "the Workers' Compensation Rating Bureau's manual of rules, rates, rating plans and classifications . . . [which was] based in part on the policyholder's experience modification, derived from the quantity of outstanding claims." *Id.* Thus, the insurer's handling of the claims, maintaining them as "outstanding" rather than promptly adjusting the claims, directly affected the calculation of premiums to be paid for the policy. In contrast to the facts here in the action brought by BCI, there the plaintiff alleged that it had on its own "closed" several claims in a matter of months that had been pending for years, and for an amount that was only a fraction of the amount reserved by the insurer.

ORDER ~ 11

*Id.* at 891. These allegations supported the notion that it had suffered adverse policy consequences with higher premium rates due to the conduct of the insurer in allowing these claims to languish. As with the other examples listed above, the insurer's actions in delayed claims handling directly impacted a liability to the detriment of the insured. BCI's claim here is far more speculative. As described earlier, BCI's claim is that (1) Transportation could have settled the claim earlier for less money, (2) had Transportation settled earlier for less money, BCI's loss ratio would have been lower, and (3) had BCI's loss ratio been lower, BCI would not have been subject to the increased premiums. This approach ignores the evidence in the file that no one could determine the cause of the powder on the grapes or the entity responsible for it. BCI has simply failed to produce evidence that Transportation had a duty to pay the grape damage claim either in full or on some comprised amount before mediation. There is also no evidence that the grape damage claim, despite this absence of proof, could have been settled for any amount other than the full amount with the same effect on BCI's loss ratio. Complicating any resolution was the beam corrosion issue and the absence of proof that BCI was legally obligated to replace all of the beams with stainless steel beams, the basis for the Court's decision granting Transportation's motion for summary judgment on indemnity coverage for BCI's replacement of phase I beams (Ct. Rec. 557). There are simply too many hypotheticals in this alleged chain of causation for BCI to proceed on such a claim. Any loss can result in an increased premium for an insured and BCI had a loss history not only on its CGL policy but also on several other policies with Transportation that caused its premiums to

increase *even without consideration of the Stevco claim*. The evidence of this in the declaration of Linda Larson was not refuted by BCI (Ct. Rec. 184-1). Assuming that such a claim could exist in theory, BCI has failed to meet its *Celtoex* burden by producing evidence to support its claim that it was harmed as a direct consequence of Transportation's actions. Therefore, Transportation's motion is granted.

B. The Cause of BCI's Increased Insurance Costs

Transportation contends that BCI is not able to demonstrate that Transportation's actions caused BCI's increased insurance costs (Ct. Rec. 182 at 17.) BCI responds as follows:

> while Bethlehem's loss ratio before Transportation's misconduct was whatever it was, the misdeeds of Transportation made that ratio truly terrible. Transportation's failure to promptly and reasonably investigate the claims against Bethlehem, and to make a reasonable effort to settle them, caused the costs of the claims to skyrocket. Transportation antagonized Stevco to the point where it hired experts to "flyspeck" Bethlehem's construction effort, and thereby develop an entire laundry list of new and potentially harmful claims.

(Ct. Rec. 240 at 11.) There are several problems with BCI's line of reasoning in this regard: (1) the primary evidence relied upon by BCI for its claim of increased costs, the expert report of Mr. Casselman, is called into question by Mr. Casselman's own deposition testimony regarding his expert report, (2) there is no evidence to support the notion that Transportation should have paid the grape damage claim because there was no evidence that BCI was responsible, (3) there is no evidence from Stevco that it would have taken any amount less than the full amount of its claim for grape damage, (4) BCI produced no evidence to rebut or at the very least, create a genuine issue of material fact

regarding Transportation's contention that BCI's premium costs would have increased regardless of the Stevco claim.

*1. Evidence of Increased Costs*

In conjunction with Transportation's motion for partial summary judgment at issue here, Transportation filed a motion to exclude the testimony of David Casselman (Ct. Rec. 155). This Court denied that motion finding that "excluding the entirety of Mr. Casselman's testimony merely because several of the opinions contained in his expert report are speculative would be an overbroad restriction." (Ct. Rec. 390 at 8.) Despite the Court's decision not to strike the entirety of Mr. Casselman's testimony, in the context of a summary judgment motion that challenges the reliability of Mr. Casselman's testimony, BCI has an obligation to demonstrate that the specific portions of Mr. Casselman's testimony relied upon to rebut Transportation's motion are based on more than speculation.

As noted above, a party opposing summary judgment has a burden as articulated in *Celotex* to identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case. 477 U.S. at 322-23. Federal Rule of Evidence 702 requires the trial court to ensure that an expert opinion is "based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The testimony should not "include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pacific R.R. Co.,* 254 F.3d 825, 829 (9th Cir. 2001).

BCI cites several factors that led to an increased settlement value of the Stevco claims: (1) Transportation's failure to accept an earlier offer regarding the salvage value of the grapes which could have resulted in a settlement of $150,000 rather than $350,000, (2) Transportation's antagonizing Stevco resulting in Stevco's "flyspecking" of the facility which led Stevco to discover additional claims, and (3) Transportation's hiring of defense counsel, coverage counsel, and a mediator.  BCI's primary support for its contention that the entire claim could have been settled for $150,000 and that Transportation's actions led to Stevco "flyspecking" is Mr. Casselman's expert report, which states,

> Stevco/Lucich was prepared to settle the entire case for the difference between the pre-sold value of the grapes ($350,000) and the salvage obtained.
> Based upon early estimates, this figure could have been less than $150,000 . . . It was only when it could not resolve the grape claim that it hired experts to 'fly speck' its facility to include every possible claim at one time.

(Ct. Rec. 185-6 at 3.)  When asked about these statements in his deposition, Mr. Casselman answered as follows:

> This is an opinion that I rely upon experience and years in the business.  And there's no right or wrong about this in retrospect.
> I mean, you can call the witness and maybe you get a semi-definitive answer, but I'm reading between the lines based on the evidence that I see.
> And what I'm saying here is that the failure to grant control, address these issues quickly, deal with Stevco like a customer, not a defendant or a plaintiff, deal with issues like they are problems to be solved, not delayed, and deal with the resolution like it's something to be achieved, not put off, these problems would have been resolved much more cheaply.  Is it less than 150- or less than 160-?  I don't know.
> I'm giving you my best opinion on what's possibly – you know, not possibly – what probably was available.
> But I could be off.  There's no way to know in retrospect, because the opportunity was lost.

ORDER ~ 15


(Ct. Rec. 242-3 at 54-55.)  In this passage, Mr. Casselman's testimony concedes that his opinion that the grape claim could have been settled for $150,000 and that the construction claims might not have been discovered if the grape claim was settled more quickly, are speculative.  And they are.  There is no evidence that Stevco would have settled for anything less than the full value of the grape damage claim which was $350,337.00 nor is there evidence that Stevco or anyone else could demonstrate to Transportation that BCI was responsible.  Nor is there evidence that the grape claim could not only have been settled for less but that all parties and insurers on the grape damage claim and the beam claim would have participated.  As his opinion is simply without foundation in fact in this case, it is speculative and not saved by his years of experience in the business.  As such, it is simply speculation and inadmissible.  Without this testimony, BCI has failed to establish a genuine issue of material fact with regard to whether Transportation's action actually resulted in an increased settlement value of the Stevco claims.

*2. The Cause of BCI's Premium Increases*

Assuming that case law permitted recovery for claims of bad faith against an insurance company when a settlement is reached within the policy limits, and assuming BCI was able to establish a genuine issue of material fact that Transportation's actions resulted in a higher settlement cost, BCI fails to demonstrate that the higher cost to settle this claim caused BCI's insurance costs to increase.  In its memorandum in support of its motion for partial summary judgment, Transportation details BCI's loss history on all of its policies, including an analysis of the impact of the Stevco claim on BCI's loss history (Ct. Rec. 182 at

ORDER ~ 16

5-8). Specifically, Transportation argues that Commercial General Liability ("CGL") carriers and their underwriters in the standard or preferred markets look for accounts with a loss ratio of 45% or lower, citing to both the unrefuted declaration of Linda Larson, the underwriter for Transportation (Ct. Rec. 184-1 ¶ 10), and the deposition of Eric Zimmerman (Ct. Rec. 185-8 at 3). Transportation contends that, even excluding the Stevco claims, and even including BCI's lines of coverage not impacted by the Stevco claims, BCI had such a poor loss ratio that "admitted CGL carriers would not have insured [BCI] at the premiums the CNA-related companies charged in 2000-2003." (Ct. Rec. 182 at 8.) In fact the unrefuted historical underwriting analysis of BCI's premium loss ratio provided by Linda Larson demonstrates a loss ratio at least twice the desired rate for a "preferred" status (Ct. Rec. 184-1). Simply put, Transportation was paying out in losses for BCI far more than the premiums BCI paid.

BCI responds, as noted earlier, by claiming that "while Bethlehem's loss ratio before Transportation's misconduct was whatever it was, the misdeeds of Transportation made that ratio truly terrible." (Ct. Rec. 240 at 11.) Transportation argues in its reply,

> BCI concedes that other claims rendered its loss history a mess, and unattractive to potential insurers. Therefore, there is no 'but for' causation between any supposed incremental increase purportedly caused by Transportation's alleged misconduct and the increased premiums BCI has paid.

(Ct. Rec. 282 at 3.) BCI does not argue or produce any evidence that would meet its *Celotex* burden that the difference between a poor loss

ORDER ~ 17

ratio and a "truly terrible" loss ratio would have impacted their later insurance costs.[4]

### IV. Conclusion

In summary, for purposes of summary judgment, the Court recognizes that an insured can bring a *Security Officers* bad faith claim for a delay in claims handing that independently and demonstrably caused damage to the insured by increasing the insured's premium costs. In this case, though, BCI has failed to establish that it suffered any detriment from Transportation's actions. BCI has failed to establish a genuine issue of material fact to show (1) settlement was achievable for a specific amount on an early date, (2) Transportation rejected or failed to accept such an early settlement opportunity, (3) the delay caused by Transportation damaged the insurability of BCI, and (4) the damage to BCI in its costs of insurance are directly traceable to delay by Transportation. Consequently, the Court grants Transportation's motion for partial summary judgment to dismiss BCI's claims based on increased insurance costs.

---

[4] In the Disclosure of James Cox, he states, "[u]nderwriters use an applicant's loss history as one of the main reasons to accept or deny coverage, and if accepted, they use it to price the exposure accordingly." (Ct. Rec. 185-5 at 5.) However, BCI did not cite to this passage in their brief or contend that such an analysis demonstrates that any incremental increase in loss history automatically corresponds to increased insurance costs. Thus the Court is left with Transportation's analysis which concludes that regardless of the Stevco claim, BCI's insurance costs would have substantially increased.

ORDER ~ 18

Accordingly, **IT IS HEREBY ORDERED:** Transportation Insurance Company's Motion for Partial Summary Judgment to Dismiss Bethlehem Construction, Inc.'s Claims for Increased Insurance Costs **(Ct. Rec. 180)** is **GRANTED.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this 30th day of March 2007.

                         s/Edward F. Shea
                         EDWARD F. SHEA
                    United States District Judge

Q:\Civil\2003\0324.MSJ.tic.increased.insurance.costs.final.wpd

ORDER ~ 19